IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMIR FATIR,                                              )
                                                        )
        Plaintiff,                                      )
                                                        )
    v.                                                  )       C.A. No. 1 6 - 3 7 5
                                                        )
GOV. JACK MARKELL, COMMISSIONER                         )       Civil Rights Complaint
ROBERT COUPE, PERRY PHELPS, CHRIS                       )       pursuant to 42 U.S.C. § 1983
KLEIN, DAVID PIERCE, PHILLIP PARKER,                    )
JAMES SCARBOROUGH, JEFFREY                              )
CARROTHERS, JOHN BRENAN, RICHARD                        )
PORTER, KEVIN FLETCHER, TONYA SMITH,                    )
CAROL POWELL, RONALD HOSTERMAN,                         )
GUS G. CHRISTO, MICHAEL WATERS, ERNEST                  )
L. KULHANEK, DAVID L. NEELD, ROBERT D.                  )
WALLIS, MICHAEL KNIGHT, GINA FERETTI,                   )
MARC RICHAMN, OFFICER RUNYUN,                           )
DAN REE HEATH, CATHY ESCHERICH,                         )
REBECCA MCBRIDE, TOBY DAVIS, WILLIAM                    )
EVANS, WADELL LUNDY, DELAWARE EYE                       )
CARE CENTER, DR. GARY I. MARKOWITZ,                     )
DR. ANDREW BERMAN, EYE PHYSICIANS                       )
AND SURGEONS, P.A., DR. PAULA C. KO,                    )
C.D. MCKAY, CONNECTIONS, BOSTON-CLARK,                  )
GLOBAL TEL* LINK, JANICE ALTMON                         )
BRAZILE, ANN VISALI, DR. MAUREEN                        )
GAY-JOHNSON , S. FLOYD, BRUCE BURTON,                   )
MATTHEW DUTTON, MATTHEW STEVENSON,                      )
FRANK PENNELL, STEVEN BILBROUGH,                        )
and CHRISTINE REAGAN,                                   )
                                                        )
        Defendants.                                     )

## Introduction

1. This is an action brought by Amir Fatir as plaintiff in his own behalf from the practice

of officials of the Delaware Department of Correction ("DOC"), and officials of the James T.

Vaughn Correctional Center ("JTVCC") and contracted agencies Connections, Delaware Eye Care Center, Eye Physicians and Surgeons, P.A., physicians and medical personnel of said contractors, and of denying his rights under the U.S. Constitution, federal statute, Delaware Constitution, Delaware statute and DOC policies, procedures and regulations.

2. Plaintiff also brings action against other defendants under the Religious Land use of Institutionalized Persons Act ("RLUIPA"), the U.S. Constitution, Delaware constitution, and Department of Correction policy, procedures and regulations for violating his right to freely practice his religion, Kemitic Yoruba Fitrah ("Fitrah") and to have his religious designation changed from Islam to Fitrah, a religion to which plaintiff has adhered for many years. Defendants have denied, obstructed and refused to allow plaintiff to freely practice his religion despite his many requests and pleas to be so allowed.

3. Plaintiff further brings action against other defendants for placing his life and health in jeopardy in violation of the Eighth Amendment to the U.S. Constitution and Delaware Constitution and law and DOC policy by exposing him to asbestos, toxic gas fumes and black mold. Defendants have been deliberately indifferent to plaintiff's life and health. Other defendants have shown deliberate indifference to plaintiff's medical rights by delaying and failing to provide proper diagnosis and treatment for an eye injury sustained by plaintiff and by delaying and denying him access to an ophthalmologist within a reasonable time despite at least two consults by physicians which were approved for him to see an ophthalmologist. Those delays have resulted in deterioration of plaintiff's vision and made correction of his eye injury less likely if not impossible.

4. Plaintiff further brings action against certain defendants for failure to apply statutory and meritorious good time credits that plaintiff has earned.

2

5. Plaintiff further brings action against certain defendants for subjecting him to a fraudulent telephone contract that charges him for 15 minutes of telephone use while knowingly and deliberately only affording him 10 minutes per call. Such overcharging violates plaintiff's First and Fourteenth Amendment rights and FCC regulations and standards as well as rules limiting the ways in which superiors can exploit inferiors when the latter are wards of the state.

6. Plaintiff further brings action against some defendants for denying him his right to three hour special visits within the prison from his wife who travels from England and has been limited to 45 minutes when all other prisoners whose visitors travel from less than a mile away are afforded 90 minute visits. Prison policy that was established as far back as the 1970s has always been that any visitor who travels from beyond a 100 mile radius is entitled to at least one three our special visit per month. Plaintiff was afforded one such 3 hour special visit (circa 2013) by then Bureau Chief Mike DeLoy, but has arbitrarily been denied the time to which he is entitled on all other occasions that plaintiff's wife has travelled from the United Kingdom to Delaware to visit him.

7. Plaintiff further brings action against certain defendants for denying his right of access to the internet and to email, thus costing him exorbitant expenditures to maintain communication with family and friends. Said cost has a chilling effect upon communication and said action violates plaintiff's right to free expression guaranteed by the First Amendment to the U.S. Constitution. In so denying plaintiff, defendants have ignored the Supreme Court's recognition of the "evolving standards of decency" that affects prisons and the manner in which prisoners are treated. Similarly situated prisoners in other prisons are allowed access to the internet and email access.

3

9. Plaintiff brings action pursuant to the First Amendment against the practice of plaintiffs in denying him a book purchased for him entitled *Sexual Secrets of the White Tigress*, a Taoist health and medical treatise that defendants denied to plaintiff in violation of the First Amendment to the U.S. Constitution, Delaware's Constitution, and DOC's own policy 4.5.

9. Plaintiff further brings action against certain defendants for forcing him to eat cancer and diabetes causing and threatening all-processed meat and food with little to no fresh vegetables and for fraudulently advertising the prison's high carbohydrate, low-cost, fast food menu as a "heart healthy diet." This action by defendants violates the Eighth Amendment to the U.S. Constitution and the Delaware Constitution of 1897.

10. Plaintiff brings action against defendants for forcing him to send out mail by signing a blank pay to voucher that permits defendants to charge plaintiff any amount of money they choose without plaintiff knowing what he is charged until his money is gone. Defendnats have overcharged plaintiff and denied is requests that his mail be weighed and he be informed of the cost before he signs a voucher allowing defendants to deduct whatever amount of money they feel like deducting from his account. The above practice violates plaintiff's First, Fourth and Fourteenth Amendment rights and violates the United State postal service's regulations and policies.

11. Plaintiff brings action against certain defendants for refusing to afford him the classification procedures requiring that they process his requests to be classified to furlough, work release, education release, special home visit and to have the outside/off-grounds employment he achieved and held during the 1990s be restored.

12. Plaintiff further brings action against the Governor of the State of Delaware for violating his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S.

4

Constitution for injuries suffered by him when Defendant Markell ("Markell") refused to afford him due process access to commutation procedure to which, under the Delaware Constitution, he is entitled.

13. Plaintiff further brings action against certain defendants for forcing him to participate unwillingly in experimental GMO food consumption by serving Genetically Modified Organism contaminated food in the prison kitchens and commissary without providing plaintiff any alternative.

14. Plaintiff further brings action against certain defendants for failing to provide healthy food choices within the prison commissary – whose profits are owned by prisoners. The prison commissary is replete with starchy, sugary, diabetes and cancer causing processed food and snacks with next to no healthy choice alternatives.

15. In violation of the RLUIPA, defendants have denied plaintiff the right to read the 25 books per week he is required to read under the dictates of his religion.

16. Plaintiff further brings action against certain defendants for denying him access to toilet facilities during yard recreation period. JTVCC provides no access to toilets during recreation.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action under the provisions of 28 U.S.C. § 1331 and 1343 because it is filed to obtain compensatory damages, punitive damages, and injunctive relief for deprivation, under color of state law, of the rights of a citizen of the United States secured by the Constitution and federal law pursuant to 42 U.S.C. § 1983. This Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Fed.R.Civ.P. Pursuant to 28 U.S.C. § 1346 this Court has jurisdiction over tort matters. Certain counts of this action implicate 42 U.S.C. 2000cc et seq., The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

19. Venue is proper under 28 U.S.C. § 139(e) (2) because the events giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

20. Defendant Jack Markell ("Markell") resides or works at 150 Martin Luther King Boulevard South, 2nd Floor, Dover, DE 19901 and is employed as "Governor of the State of Delaware." As Governor he has the powers granted to him under Article VII of the Delaware Constitution to grant pardons and reprieves once the applicant has been recommended by a majority of the Delaware Board of Pardons.

21. Defendant Robert Coupe ("Coupe") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Commissioner of Correction." As Commissioner he has powers, duties and functions appointed to him by 11 Del. C. § 6516, as follows: "The Commissioner shall assume full and active charge of the Department, its facilities and services, and is the chief executive and administrative officer of the Department. As Commissioner, Defendant Coupe has

21a.   Defendant Matthew Stevenson ("Stevenson") resides or works at 1181 Paddock Rd., Smyrna, DE 19977 and is employed as "lieutenant".

6

powers, duties and functions appointed to him by 29 Del. C. § 8903, including but not limited to, the following:

The Commissioner shall:

(1) Supervise, direct and account for the administration and operation of the department, its bureaus subbureaus, offices, functions and employees;

(3) Appoint such additional personnel as may be necessary for the administration and operation of the Department within such limitations as may be imposed by law.

22. Defendant Chris Klein ("Klein") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Deputy Commissioner" and was also employed, during the relevant period, as "Bureau Chief of Prisons" and as "Medical Bureau Chief." He is responsible for all prison operations and functions.

23. Defendant Perry Phelps ("Phelps") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Bureau Chief of Prisons." He is responsible for all prison operations and functions.

24. Defendant David Pierce ("Pierce") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Warden" of the James T. Vaughn Correctional Center ("JTVCC").

25. Defendant Phillip Parks ("Parks") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Deputy Warden" of the James T. Vaughn Correctional Center ("JTVCC").

26. Defendant James Scarborough ("Scarborough") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Deputy Warden" of the James T. Vaughn Correctional Center ("JTVCC").

26a. Defendant Frank Pennell resided or worked at 1181 Paddock

7

road and was employed as "chaplain" until his retirement.

27. Defendant Jeffrey Carrothers ("Carrothers") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Security Chief" of the James T. Vaughn Correctional Center ("JTVCC") and holds the rank of Major.

28. Defendant John Brennan ("Brennan") resides or works at 1181 Paddock Road,
C-\-:e.<sup></sup>
Smyrna, DE 19977 and is employed as "Security" of the James T. Vaughn Correctional Center
ʎ
("JTVCC") and holds the rank of Major.

29. Defendant Richard Porter ("Porter") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Lieutenant." This Defendant is in charge of the JTVCC's Minimum Security Multi-Disciplinary Team ("MDT") which is the initial classification committee.

30. Defendant Kevin Fletcher ("Fletcher") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Master Counselor." This Defendant is the second of two members of the JTVCC's Minimum Security Multi-Disciplinary Team ("MDT") which is the initial classification committee.

31. Defendant Tonya Smith ("Smith") resides or works at 1181 resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Support Services Manager" of JTVCC. This defendant is responsible for all commissary expenditures, expenditures of supplies, clothing, and recreation of monies allocated for prisoners from the legislature and from the profits of the Inmate Commissary Trust Fund. She is also in charge of the mailroom, laundry and clothing dispensary.

32. Defendant Carol Powell ("Powell") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Support Services Officer." This defendant is in charge of the prison mailroom and commissary.

8

33.  Defendant Ronald Hosterman ("Hosterman") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Treatment Administrator." This defendant is in charge of treatment programs, personnel, counselors, the Institution-Based Classification Committee ("IBCC") and is responsible for "conduct[ing] quarterly inspections of all buildings for cleanliness, general living conditions and security," pursuant to the State of Delaware's Department of Human Resources published description of the Correctional Treatment Administrator's Essential Functions.  On information and belief this Defendant has not conducted such an inspection since his promotion to Treatment Administrator circa 1990.

34.  Defendant Gus G. Christo resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Chaplain" of JTVCC.

35.  Defendant Michael Waters ("Waters") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Chaplain" of JTVCC.

36.  Defendant Ernest L. Kulhanek ("Kulhanek") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Maintenance Supervisor" of the DOC.

37.  Defendant David L. Neeld ("Neeld") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Maintenance Supervisor" of JTVCC.

38.  Robert D. Wallis ("Wallis") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Maintenance Supervisor" of JTVCC.

39.  Defendant Michael Knight ("Knight") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Food Service Director."

40.  Defendant Gina Ferretti ("Ferretti") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Registered Dietician."

40a.  Defendant Steven Bilbrough resides or works at 1181 Padock Rd. and is employed as W-Unit lieutenant.

9

41. Defendant Marc Richman ("Richman") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Medical Bureau Chief."

42. Defendant Runyun ("Runyun") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Correctional Officer."

43. Defendant Dan Ree Heath resides or works at Central Offender Records ("COR"), 245 McKee Road, Dover, DE 19901 and is employed as "Records Officer." This defendant is responsible, inter alia, for maintaining and applying good time credit records and deducting same from one's sentence.

44. Defendant Cathy Escherich ("Escherich") resided or worked at Central Offender Records ("COR"), 245 McKee Road, Dover, DE 19901 and is employed as "Director of COR." This defendant is responsible, inter alia, for maintaining and applying good time credit records and deducting same from one's sentence.

45. Defendant Rebecca McBride ("McBride") resides or works at Central Offender Records ("COR"), 245 McKee Road, Dover, DE 19901 and is employed as "Director of COR." This defendant is responsible, inter alia, for maintaining and applying good time credit records and deducting same from one's sentence.

46. Defendant Toby Davis "(Davis") resides or works at Central Offender Records ("COR"), 245 McKee Road, Dover, DE 19901 and is employed as "Information Resource Manager for the DOC's Office of Central Offender Records Director of COR." This defendant is responsible, inter alia, for maintaining and applying good time credit records and deducting same from one's sentence.

46a. Defendant Christine Reagan resides or works at Connections, 500 W. 10th St., Wilm., DE 19801 and is employed as "medical diretor."

47. Defendant William "Bill" Evans ("Evans") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Classification Director." This Defendant is responsible for classification systems and procedures as well as "special programs" for the DOC.

48. Defendant Wadell Lundy ("Lundy") resides or works at 245 McKee Road, Dover, DE 19901 and is employed as "Food Service Administrator."

49. Defendant Delaware Eye Care Center is located at 833 S. Governor's Ave., Dover, DE 19904. This Defendant is a "state actor" who is contracted by DOC.

50. Defendant Dr. Gary I. Markowitz ("Markowitz") resides or works at Delaware eye Care Center, 833 S. Governor's Ave., Dover, DE 19904. This Defendant is an Ophthalmologist who was contracted to diagnose and treat Plaintiff's eye injury after the optometrist and physician at JTVCC put in a consult that was approved. Instead of seeing Plaintiff, this defendant had an optometrist, Dr. Andrew Berman, substitute for him. Dr. Berman is not qualified to treat or diagnose plaintiff's injury.

50. Defendant Dr. Andrew Berman ("Berman") resides or works at Delaware eye Care Center, 833 S. Governor's Ave., Dover, DE 19904. This defendant substituted for Dr. Markowitz in examining Plaintiff even though the consult was for Plaintiff to see an ophthalmologist, not an optometrist. This Defendant then put in a consult for Plaintiff to see a retina specialist, thus avoiding the two approved consults for him to be examined and treated by an ophthalmologist.

51. Defendant Eye Physicians and Surgeons, P.A. is located at 1207 North Scott St., Wilm., DE 19806. This Defendant is a "state actor" who is contracted by DOC.

52. Defendant Dr. Paula C. Ko ("Ko") resides or works at Eye Physicians and Surgeons, P.A. is located at 1207 North Scott St., Wilm., DE 19806. This Defendant is a "state actor" who

11

is contracted by DOC. Defendant Ko examined Plaintiff's eye and told him there was nothing wrong with him, but put in his file that he suffered from "vitreous detachment." This Defendant established neither treatment nor future examination, even though the medical establishment has made it abundantly clear that a vitreous detachment is likely to become a retinal detachment. Moreover, this Defendant refused to provide Plaintiff with an ultrasound examination even though the protocol is for a potential retinal detachment, if unfound, to be examined with ultrasound if the patient has cataracts. Plaintiff was diagnosed by Defendant Ko with cataracts, but was not provided the requisite and standard ultrasound examination.

53. Defendant C.D. McKay resides or works at Connections, 500 W. 10th St., Wilm., DE 19801 and is employed as "Medical Director."

54. Defendant Connections is located at 500 W. 10th St., Wilm., DE 19801.

55. Defendant Boston resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Visiting Room Sergeant."

56. Defendant Global Tel* Link ("GTL") is located at 2609 Cameron St., Mobile, AL 36607.

57. Defendant Janice Altmon Brazile resides or works at GTL, 2609 Cameron St., Mobile, AL 36607.

58. Defendant Ann Visali resides or works at 245 McKee Rd., Dover, DE and is employed at Chief of the Bureau of Management and Budget.
mus ccc

59. Defendant Dr. Gay-Johnson resides or works at Connections, JTVCC Infirmary, and 1181 Paddock Road, Smyrna, DE 19977 and is employed as "physician." This defendant neglected to promptly or properly examine or treat Plaintiff's eye injury and showed deliberate indifference to his injury and the potential loss of his vision by refusing treatment but instead

12

trying to push high blood pressure pills on him and then forcing him to undergo psychological diagnosis because he exercised his right to refuse potentially lethal drugs which he did not need or want. That is a violation of Connection's own protocol and plaintiff's rights. Defendant Gay-Johnson violated plaintiff's Eighth Amendment protection against cruel and unusual punishment.

60. Defendant Boston-Clark ("Boston-Clark") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Correctional Sergeant" in charge of the visiting room. She is responsible for visiting procedures including assuring that visits receive the appropriate and allotted amount of time.

61. Defendant S. Floyd ("Floyd ") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Correctional Sergeant" in charge of the visiting room gate house. Inter alia, he is responsible for admitting visitors to the visiting room and processing them out as well as visiting procedures including assuring that visits receive the appropriate and allotted amount of time.

62. Defendant Bruce Burton ("Burton") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Correctional Captain" in charge of all compound operations. He is in charge of the minimum side of the compound, including W-Building. He is responsible for all operations of the facility's housing units and other buildings in which prisoners work or utilize. This defendant was deliberately indifferent to the existence of threat of infectious diseases such as MRSA, HIV, scabies, and Hepatitis C and refused to provide the necessary cleaning supplies and to maintain the infectious disease procedures and protocols when the health of prisoners, including plaintiff, was at risk.

63. Defendant Matthew Dutton ("Dutton") resides or works at 1181 Paddock Road, Smyrna, DE 19977 and is employed as "Correctional Corporal." He works as the Inmate

13

Grievance Chairman. This defendant sits in on and/or chairs the Inmate Medical Grievance hearings during which private medical information that is protected by doctor-patient confidentiality is revealed in violation of the federal Health Insurance Portability and Accountability Act of 1996 ("HIPPA").

64. Each defendant is sued in his or her individual and official capacity.

## *CLASSIFICATION*

65. The official mechanism for an inmate to move through the system is via classification. There are various boards which conduct classification, but the only one in which a prisoner can make his request is at the multi-Disciplinary Team ("MDT") level or "first board" of classification. It is the duty of that board to record whatever classification requests the prisoner makes and to then vote to recommend or not recommend those requests.

66. The prisoner is supposed to be given a form to sign to acknowledge that his requests for classification have been duly and properly recorded.

67. The MDT's recommendations are then forwarded to the Institution-Based Classification Committee ("IBCC") which then forwards it to the Central Institutional Classification Committee ("CICC"). If the requests involve outside-the-prison decision, the CICC votes either to recommend or not recommend and its recommendation is then forwarded to the Institution Release Classification Board ("IRCB") which votes to approve or deny the request. If the IRCB approves of the request, then the Bureau Chief has to approve and sign the request and if that occurs then the prisoner can access the outside-the-prison program to which he has been duly classified.

14

68. A prisoner's successful attainment of outside/off-grounds status is not an easy achievement, nor is it granted cavalierly. It can take decades for a prisoner to achieve such status.

69. In 1988 plaintiff achieve minimum security classification and transferred to the Minimum Security Unit (W-Building). Two years later he secured outside status and a year later he obtained the coveted "outside/off-grounds" status at Central Supply Warehouse and later at the Food Service Division of DOC (which was also housed within Central Supply). While working for Central Supply and then Food Service as a computer programmer and system's analyst plaintiff regularly received "outstanding" work evaluations and received a letter of commendation from the Food Service Director, Robert Wolfson.

70. Plaintiff has a liberty interest in being afforded the proper classification procedures and failure to rant him such is a denial of his due process rights as well as his state-provided liberty interests.

71. On or about September 8, 2015 plaintiff attended his annual classification hearing before the minimum security classification teamed called the MDT. The MDT consisted of Lt. Richard Porter and Counselor Kevin Fletcher. Plaintiff, as indicated above, had already achieved outside/off-grounds status, duly requested that the MDT classification committee consider recommending him for classification back to outside/off-grounds work status and to consider recommending him for the furlough, work release, education release, and special visit[1] programs.

72. Lt. Porter stated that those programs "were still on the books" and stated that "they should never have stopped using them because they worked." He explained to Counselor

---

[1] There are two types of special visit which will be litigated in this case. One is an outside visit that is a furlough accompanied by an armed prison guard and the other is a visit within the prison for at least three hours when a visitor has traveled from beyond a 100 mile radius. The type requested at the MDT classification was the escorted furlough type.

15

Fletcher that he knew plaintiff and others who'd taken part in such programs and had done well. Lt. Porter promised plaintiff that he would record plaintiff's requests and forward the MDT's recommendation.

73. For some reason, however, Lt. Porter did not put plaintiff's requests into the record and failed (at least on the record) to vote whether or not to recommend plaintiff for the programs to which he'd asked to be classified.

74. Weeks later plaintiff received official notice of various approvals from the IBCC, but none of the above requests were listed as either approved or disapproved. It was then that plaintiff realized that the MDT had neglected to process his requests.

75. Plaintiff then appealed the classification action to the prison Warden and also filed a grievance. The Warden forwarded plaintiff's appeal to Classification Officer II Stacey Hollis who wrote that plaintiff should "discuss your requests with your unit counselor to come up with a consensus before your MDT."

76. That suggestion amounted to a year's denial since he would not be classified until a year later and had already taken the steps CO II Hollis directed him to take. Moreover, there is no obligation that a prisoner "come up with a consensus before" the MDT hearing.

77. Plaintiff fulfilled what is required at step one of the classification process by duly making his requests. Defendants violated plaintiff's rights by failing to afford hi the process and by failing to vote to recommend or not recommend his requests and forward their recommendation to the next board.

78. In addition, CO II Hollis wrote that plaintiff could not appeal the classification based upon a new procedure at JTVCC that the only classification decisions which could be appealed were those which increased a prisoner's level of security, e.g., from minimum to medium or

16

maximum. Ms. Hollis, inaccurately, wrote that "outside/off-grounds status, furlough, work release and education were not addressed at any of the classification levels (MDT, IBCC), so it cannot be appealed. Per classification policy, the only item that can be appealed is an increase in a security level."

79. In fact, plaintiff did discuss those classifications at the first (MDT) level of classification. It was the responsibility of the MDT to forward plaintiff's requests to the next highest board so they could be discussed. Plaintiff (and no prisoner) has the opportunity to discuss classification requests at any level above the MDT.

80. On October 9, 2015 plaintiff wrote CO II Hollis to correct her misunderstanding: "You state that outside/off-grounds, work release, furlough and education release were not raised at MDT, IBCC. However, I did raise those and specifically asked Lt. Porter and Counselor Fletcher to record my requests, made at the MDT classification level, in writing so a record would be made in case I needed to pursue the enforcement of my rights in court."

81. On September 27, 2015 plaintiff filed a grievance on the MDT's failure to afford him the classification process.

82. Circa 1985 plaintiff was classified to and placed in the DOC's Gradual Phasing program after extensive diagnostic and classification procedures. The purpose of Gradual Phasing was, as its name indicates, to gradually phase plaintiff from maximum security to medium security, to minimum security, to outside status, to off-grounds status, to work release and then to actual release from incarceration.

83. Plaintiff had an expectation and implied contractual agreement with the DOC that if he held up his end of the chain of responsibilities, they would hold up theirs.

84. Plaintiff did indeed phase from then Supermax (Maximum Security Unit) all the way to Minimum Security and outside/off-grounds status. During that period plaintiff not only participated in programs, he designed and managed several programs on behalf of the DOC, some of which continue to this day. Plaintiff created, co-created, designed and managed such programs as the Lifers Program, Youth Community for Young Offenders, Pre-Release Program.[2] *The Isthmus* newspaper[3] and many other programs and activities including a classification documentary film. Plaintiff was the first prisoner invited to address the graduating class at the DOC Academy, conducted seminars for George Washington University and Delaware State University, worked extensively with Commissioner Robert Watson, Bureau Chief Hank Risley, Warden Walter Redman, and then Treatment Administrator Donald R. Davis in developing programs for victims of crime, seminars for the community and the department at the Women's Prison and Gander Hill. Along with attorneys Eugene Maurer, Jr. and Kevin O'Connell, he conducted a seminary at the request of Judge Vincent Bifferato for new attorneys and new Deputy Attorneys General inside Judge Bifferato's chambers. Plaintiff designed computer systems for the Food Service Division and for Central Supply which were used in prisons state-wide.

85. At the request of Commissioner Watson and Warden Redman, plaintiff twice participated in Executive Committee Meetings and wrote the proposal that funded and brought the Life Skills Program to the Delaware Department of Correction.

---

[2] The Pre-Release Program was awarded a Point of Light Award by President George H.W. Bush.

[3] Plaintiff gave the newspaper its name as it was intended to be an informational link that connected the free community with the incarcerated community and the prison staff with the inmate population. During plaintiff's editorship, *The Isthmus* won a journalism award in England, was quoted as an authority by *The News-Journal*, and was touted by author Norman Mailer as "the finest prison publication I've ever seen

18

86. Plaintiff was the first prisoner in Delaware who had been on Death Row post *Furman v. Georgia* to be granted a 4 to 0 positive recommendation for a sentence commutation to life with parole. That recommendation was signed by the Secretary of State and forwarded to Governor Mike Castle, but reportedly was never signed.

87. Plaintiff has written books, saved lives of both inmates and staff members, educated inmates to get GED's and taught at Central Arizona College (within the Arizona Prison System to which he was transferred in 1996, reputedly, "to improve your chances of making parole."

88. Plaintiff fulfilled his obligations under Gradual Phasing and should have, by now, been enjoying the fruits of the agreement indicated by the Gradual Phasing process.

89. Defendants are likely to attempt to justify their de facto denials of plaintiff's requests based upon state statutes enacted long after his incarceration which deny him the rights, privileges and programs to which he was entitled at the time of his offense and which, in some cases, he has already participated in such as outside status and outside the institution activities and contacts.

90. The Inmate reference Manual ("IRM") states:

## FURLOUGHS

Title 11, Section 6538 of the Delaware Code gives the Division
the authority to grant furloughs for the purposes of visiting
families and taking job interviews. All sentenced persons are
eligible for this program and are encouraged to apply for it.
Selection of those eligible will be made by the Institutional
Classification Committee. For more information about this
program refer to Appendix F in the back of this manual.

19

*Inmate Reference Manual*, page 23.

91.  Plaintiff is legally eligible for furloughs and had the right to be considered for classification to the furlough program.

> The law gives the Division of Adult Corrections the authority to grant furloughs for the purpose of visiting families or taking job interviews.
>
> … With regard to the… family type furlough, the underlying rationale for granting such is either the renewal or retention of your family relationships and the resocialization uppermost in mind.
>
> … The route of approval is:  Unit Classification Team to Institution Classification Committee to Superintendent to Division Director.  Inmates requesting furloughs are required to write a letter to the unit classification team stating reasons, person(s), transportation, address and telephone number.
>
> Furloughs are open to the inmate population with the exception of pre-trial and other unsentenced inmates.
>
> There are no absolute limits or number.  It is expected that roughly 3 to 5 furloughs could be granted per week and and perhaps a dozen on major holidays (Thanksgiving, Christmas, Easter).  Therefore, the Unit Classification Teams should forward recommendations to the ICC as they deem appropriate.  Many problems will be avoided if the Unit Classification Teams adhere to what has been stated beforehand with emphasis on merit and resocialization.

Once a furlough has been granted, the inmate must plan it with his counselor. A field investigation is mandatory.

Ordinarily furloughs extend from Friday evening to Sunday evening. Certain holidays which fall on other days of the week will, of course, be exceptions to this. Requests for exceptions to this will be considered on the merits of the individual case.

The host family will be responsible for transportation to and from the institution.

All recommendations must be made 30 days in advance.

*- Inmate Reference Manual,* Appendix F

92. Plaintiff is also eligible for consideration for the work release program.

## WORK RELEASE

The primary objective of this program is to provide treatment and training to you so that you may return to the community to lead a law-abiding, productive life. Besides enabling you to review your contacts with the community, it also affords you the opportunity to be productive and provide for your family while imprisoned.

… Both long-terms and short-terms are eligible for this program provided they have been classified into Minimum custody. If you desire to become a part of the work release program and feel you are eligible, contact your counselor.

- *Inmate Reference Manual,* page 24

Plaintiff attained Minimum custody in 1988 and continues to be a minimum security prisoner today.  He is eligible for work release and was denied his right to be duly classified by defendants.

93.  Plaintiff is eligible for education release but was denied his right to be considered to that program by defendants.

EDUCATION RELEASE

> If you desire to advance your education on the college level or in any other educational area, such as the trades or technical training while still in prison, you can do so by becoming a part of the educational release programs.

> - *Inmate Reference Manual*, page 24

### *RELIGION AND RLUIPA*

94.  Plaintiff seeks to enforce his right to study, practice, and teach his religion pursuant to rights granted to him by the First Amendment of the United States Constitution, the RLUIPA, the Constitution of 1897 of the State of Delaware and Department of Correction policies.

95.  Plaintiff began learning and practicing Fitrah in the late 1980s.  he gradually but inexorably evolved from Islamic practices to those of Fitrah.  By the late 1990s his official religious designation – which was also printed on his prison identification card by the Arizona DOC – was Fitrah.

96.  When he returned to Delaware in December 2004 pursuant to a settlement agreement in the case *Fatir v. Snyder*, the prison computer system continued to list his religion as "Black Muslim."  He asked the intake officers to change that designation because it was no

22

longer accurately depicted his religion.  The intake officer told him he only had to notify the prison chaplain and his religion would be changed.

97.  Plaintiff did make requests to then Chaplain Frank Pennell who laughed when he told him that his Fitrah religion included African Traditional Religious Practices better known as Kemitic Yoruba.

The RLUIPA states:

42 USC § 2000cc.   Protection of land use as religious exercise

(a) Substantial burdens.

(1) General rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) Scope of application. This subsection applies in any case in which--

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if  the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use

regulation or system of land use regulations, under which a government makes, or has

in place formal or informal procedures or practices that permit the government to make,

individualized assessments of the proposed uses for the property involved.

98. Article 1 § 1 of the Delaware Constitution states: "No power shall or ought to be vested in or assumed by any magistrate that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship, or a preference given by law to any religious societies, denominations, or modes of worship."

Plaintiff will show that defendants have violated the Delaware Constitution by interfering with and attempting to control his religious practice and have, moreover, acted in a discriminatory manner against plaintiff's religious exercise while showing preference to protestant Christianity and to the Wahhabi sect of Saudi Arabia.

99. All other religious preferences, in the JTVCC, are treated as "religions non grata."

100. Plaintiff requested that his religious designation be changed from Islam to Fitrah. He also requested that he be allowed to practice his religion in accordance with the RLUIPA and other authorities mentioned above.

101. His requests have fallen on deaf ears and his efforts have been thwarted, obfuscated and ignored.

102. Although official DOC policy 5.1 states:

"he Department recognizes that all offenders are entitled to certain basic

rights afforded by the Constitution of the United States, as well as Federal and

State statutes. Therefore, it is the policy of the Department of Correction to

acknowledge and protect the basic rights of offenders in its custody.

24

"The Executive Committee, in cooperation with the Attorney General's
Office, shall identify all offender rights including, but not limited to: a safe and
healthful living environment, due process for alleged rule violations, freedom of
speech and religion, access to the courts and a grievance process allowing for
administrative and judicial review.

"It will be the responsibility of each bureau chief/section manager to
develop procedures, for review and approval by the Commissioner, to ensure
offender rights are safeguarded. The procedures should require all staff involved
with offenders receive instruction and training specific t this policy and its
corresponding procedures."

103. Actual DOC practice is decidedly different in each area mentioned in DOC policy
5.1 and particularly in the area of religion.

104. In actual practice DOC opposes, restricts, denies and suppresses any religious
practice that differs from its two de facto state religions, Wahhabism and Protestantism. Even
the Roman Catholic Church has suffered discrimination in the Vaughn Prison since the arrival
at that prison of then Warden (now Bureau Chief) Perry Phelps who carried out an ongoing
vendetta against Catholic Priest Father Jackson due, many Catholics believe, to Father
Jackson's alleged sexual orientation.

105. While giving lip service to respect for religious rights, defendants have denied all
who do not follow their two "state religions" equal right to practice and study their religions.

106. Although many other religions have adherents and believers, starkly absent from
JTVCC approved religious activities are those of Wicca, Eckankar, Moorish Science, Buddhism
(despite many petitions and some from even the supposedly necessary "outside sources"),

Shaivism (a branch of Hindu-oriented worshippers of Shia and despite many petitions and eve

the supposedly necessary "outside sources"), Sikhism, Shia Islam, Ahmadiyya Islam, Sufism,

Ausarianism, Yoruba, Taoism, Native American Religion, Hebrew Israelite, Odinsim, Jehovah

Witnesses, Santeria, or any religion except the two defacto Delaware DOC "state religions."

No religion that doesn't fall under defendants' narrow views of what people should be allowed

to practice and adhere is allowed within the prison.  Non-protestant, non-Wahabbi religions are

fiercely suppressed in JTVCC.

107.  DOC's self-congratulatory claim of allowing the "free practice of religion" is a bold

and enormous lie and an insult to the prisoners wose hopes of worshipping the deities of their

conscience have been crushed, mocked, ridiculed and obstructed as well as to the men and

women religious volunteers who've had the prison doors slammed in their faces when they

attempted to minister to the needs of prisoners of their various faiths.

108.  DOC policy 5.2 states that all inmates must be treated in a humane and impartial

manner and that there msut be no discrimination based on rae, sex, religion, language, political

affiliation, national or social origin, or economic status.  Yet defendants allow religious

discrimination to occur at Vaughn on a daily basis.

109.  Defendants' denial of plainff's right to freely practice his religion runs afoul of

well-established case law including this circuit's *Washington v. Klem,* 497 F.3d 272 (2007).

See also *Reed v. Faulkner*, 842 F.2d 960- 961-62 (7th Cir. 1988); *Sing v. Goord*, 529 F. Supp. 2d

487, 499-509 (S.D.N.Y.); *Adams v. Stanley*, 237 F. Supp. 2d 136, 139-49 (D.N.H. 2003);

*Warsoldier v. Woodford*, 418 F.3d 989, 991-92, 994-1001 (9th Cir. 2005); *Campos v. Coughlin*,

854 F. Supp. 194 (S.D.N.Y. 1994); Lawson v. Wainwright, 641 F. sup. 313, 315; *Lindell v.*

*McCallum*, 352 F. 3d 1107, 1108; O'bryan v. Bureau of Prisons, 349 F.3d 399, 400; *Mack v. O'Leary*, 80 f.3d 1175, 1177-78; *Torcasco v. Watkins*, 81 S. Ct. 1680.

110. DOC policy 4.1 "requires all decision-making affecting the rehabilitation... of offenders or detentioners... to be fair and equitable." Religious practice has been placed under the Treatment Administration as part of rehabilitation. This case will show that it has been anything but "fair and equitable." In fact, Treatment Administrator Ronald G. Hosterman has been the prison's point man in denying and obstructing plaintiff's right to practice his religion.

111. Policy 4.3 claims that DOC policy affords prisoner "the right to limited participation in any decision-making that could adversely affect their freedom or well being." Defendant Hosterman refused to allow plaintiff to practice his religion unless plaintiff provided corroboration of his beliefs from a "bonafide outside source." Although such a requirement violated the RLUIPA's prohibition against overly burdensome requirements, plaintiff -- having no access to telephone books, internet, telephone calls or any means of contacting of contacting Fitrah-oriented outside sources, requested that the chaplain assist him in contacting said sources, Hosterman's reply was "No, the staff are not your researchers. You have all the resource you need in your ability to correspond with outside resources, and an abundance of time to pursue that. I will not entertain any further obfuscation on your part. When you have something to share in regards to what was asked of yo please forward it. Thank you for your cooperation."

112. Defendant Hosterman's obstruction of plaintiff's attempt to practice his religion stands in stark contrast to the manner in which Christians are accommodated. The head chaplain, Defendant Cristo, is a Christian as are all of the chapel clerks. To access resources for the Protestant Christians, Defendants Cristo and Hosterman make telephone calls to coordinate with outside ministers, reverends, deacons and officials. No "similarly situated" Christian is told to use his own resources to practice his religion.

113. Chaplains are paid to assist in the development of religious activities equally. The reality at JTVCC, however, is that religion is a closed club of Waters for Wahhabis and Cristo/Pennell/Hosterman for Protestants. The religious discrimination at Vaughn prison is blatant and barely even hid..

114. Earlier, Defendants Hosterman and Pennell sought to obstruct plaintiff's religious freedom by referring his request to the Wahhabi Muslim Chaplain, Defendant Michael Waters. As plaintiff is not a Muslim and wished to have his religious designation changed from Islam to his actual religion, Fitrah, Imam Waters had no business being involved in plaintiff's request for permission to practice a religion that Imam Waters loathes.

115. Imam Waters is a Saudi Arabia indoctrinated Wahhabi who finds plaintiff's religion to be anathema. To any Wahhabi, plaintiff is considered to be an apostate and under Wahhabism, he should either be beaten near to death or murdered like the Saudis and other Wahhabis execute people who don't adhere to their version of Islam.

116. Because plaintiff believes in and invokes the conscious energy gestalts (deities) of ancient Kemit (Black African Egypt before the invasion of the Greeks, Romans and Arabs) such as Tehuti (Thoth), Ausar (Osiris), Heru (Horus), Het-Heru (Hathor) as well as those of West

Africa such as Obatalah, Ogun, Shango and utilizes oracles such as the Metu Neter, I Ching and Ifa, Imam Waters and his Saudi Arabian often illiterate teachers or "shaykhs" regard him to be a polytheist and even a sorcerer and magician who should, under their corrupt interpretation of Sharia law, be killed immediately... as hundreds are killed in Saudi Arabia on a regular basis.

117. Yet Defendant Hosterman insisted that plaintiff beg a man with beliefs like those of Imam Waters to allow him to practice his religion. Such an act is tantamount to telling a German Jew to seek the blessings of Adolph Eichmann in his quest to open a synagogue.

118. That is the nature of "free practice of religion" that JTVCC actually practices.

119. The proper standard for evaluating a religious claim under the RLUIPA is the belief of the institutionalized person, not some state-blessed "bonafide outside source to give validity to your request," as required by Defendant Hosterman.

120. Defendants have violated both the RLUIPA and the establishment clause of the United States Constitution and Delaware's own Constitution as well DOC's own policies by forcing plaintiff to get civilian practitioners of Kemitic Yoruba Fitrah to submit themselves to Defendant Hosterman's religious test of who is and who is not bonafide in order for plaintiff to practice his religion.

121. The State would have to get deeply into the religious business – a violation of separation of church and state – to determine (1) What the State means by "bonafide", (2) What criteria are used to decide and decree that a source is bonafide or not, and (3) Who is the judge as to the bonafides of a particular source and what qualifications does that would-be judge possess to qualify him or her qualified to make such judgments?

122. Although the Commissioner is required to provide training in the rights of prisoners, it is obvious that he has failed to provide training to those who manage the religious affairs of prisoners regarding what prisoners' federal rights are under the RLUIPA, the U.S. Constitution or even what their many state's rights are.

## *BUILDING ASBESTOS, MOLD AND TOXIC GAS*

123. Since it was built in 1984, W-Building ("Minimum Security") has exposed prisoners, including plaintiff, to asbestos under the floor tiles and deadly black mold in the showers.

124. Plaintiff lived in W-Building from February 4, 1988 until June 29, 1996 and from June 28, 2007 until the present.

125. During all of that time, over seventeen years, he has been exposed to asbestos.

126. Defendants knew plaintiff and other prisoners were exposed to asbestos, knew the dangers such exposure posed to plaintiff's health, and did nothing to remove the asbestos or to protect plaintiff from its effects.

127. The DOC removed asbestos from D-Building's basement during the 1980s, yet left asbestos in place in W-Building.

128. Defendants were aware of the existence of asbestos and its potentially harmful and lethal effects. That is why when outside workers were contracted by DOC to reputedly convert the showers and bathroom toilets to preserve water, before the outside contractors were permitted to work, the prison had the tiles in the W-Building showers and bathrooms (the areas in which the outside contractors worked) removed to reduce the likelihood of asbestos exposure to the

non-prisoners.  However, the tiles and asbestos were left in the hallways, recreation rooms, cells and every place where inmates and guards work and live.  Apparently, "Contractor Lives matter" in ways that inmates' and guards' lives don't.

129.  Defendants have been deliberately indifferent to the risk asbestos, mold and gas pose to plaintiff's health and safety.

130.  Defendants claim that the asbestos is safe, yet also advance an argument that they plan to remove the asbestos covering tiles in the Spring of 2016.  That begs the question: if the asbestos and tiles are safe, why remove them at all?  And if they are not safe, why did it take over 30 years to remove said asbestos when DOC had already removed asbestos from D, B, C, and E buildings before W-Building even opened?  So the administration knew the dangers that asbestos carried and yet did nothing to protect inmates and guards from exposure to it.

131.  Although money was allocated years ago for placing stainless steel over all of the W-Unit's 12 shows, that money mysteriously disappeared after a single shower, J-tier's, was refitted.  The DOC/JTVCC administrators knew that the showers were dangerously replete with mold but did nothing to properly remove it or to protect prisoners from it.

132.  Defendants' actions and inactions amount to deliberate indifference in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Moreover, it violates DOC's own policy 5.1 requirement to provide "a safe and healthful living environment."

133.  Defendants' deliberate indifference to mold and asbestos exposure violates DOC policy 5.2's edict that all inmates must be treated in a humane manner and Delaware's Constitution's Article I which states that "In the construction of jails proper regard shall be had for the healthcare of inmates."

134. No one would sanely and seriously set forth that long term exposure of inmates to asbestos and black mold constitutes proper regard for their healthcare.

135. DOC policy 8.13 claims that DOC has to comply with all applicable fire, health, safety and sanitation codes "to ensure the health and well-being of staff and offenders."

136. As discovery proceeds in this case and evidence is provided it will be seen that nothing could be further from the truth. A prison asbestos case in the 11th Circuit is instructive. "In the present case, the plaintiff's complaint, liberally construed, appears to allege a violation of the Eighth Amendment through the defendants' deliberate indifference to the plaintiff's serious medical needs. The plaintiff alleges that the defendants forced him to remain in a dormitory when the dormitory atmosphere was filled with friable asbestos. Further, the plaintiff alleges that the defendants knew of the health danger and yet refused to move the plaintiff to an asbestos-free environment. This constitutes deliberate indifference to the plaintiff's serious medical needs. Accordingly, the plaintiff has alleged a constitutional violation under Bivens. Id. ; see also Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir.1982)." *Powell v. Lennon*, 914 F.2d 1459, 1463.

137. W-Building converted to natural gas in 2015. A small shed was erected that housed a temporary chimney that released its gas right at the level of the second floor where the windows of F-tier and H-tier are. However, the chimney pipe was so low that gas flowed continuously into the rooms on F, E, H and G tiers and from there into the hallways, endangering the lives of prisoners from carbon monoxide and methane poisoning. After plaintiff complained about the gas situation, the chimney was raised a bit higher, but the gas continued to flow into the rooms and throughout the unit. When the permanent chimney was installed, the gas problem

continued without any noticeable improvement. Moreover, there appear to be leaks in the boiler room as gas is smelled emanating from there on a constant basis.

138. The constant gas exposure causes headaches, dizziness and respiratory problems. Moreover, the same type of system hastily installed in W-Building blew up in another prison and resulted in multiple deaths of prisoners.

139. Gas inhalation can kill people while they sleep. Alberto Miranda's room was cell 13 on F-tier. The gas flows strongly into that room and prisoners on that side of F-tier must keep their windows shut, even during the hot summer, to reduce the amount of gas inhalation. Miranda was suddenly stricken during the night, became brain damaged and died not long afterwards.

140. Plaintiff would like to avoid a similar fate from the prison's deliberate indifference to his exposure to natural gas.

141. As there is no ventilation in the cells in W-Building other than an open window, there is no means of keeping the gas from being inhaled by the residents, including plaintiff. In addition, line staff are exposed to the same toxic fumes for eight hours each day and sometimes for longer when they work overtime, which they must, given the slave wages that the average line officer has to attempt to subsist on.

142. During March 2015 a building corporal smelled the gas coming into the window in cell 15 and wrote a work order asking Defendant Kulhanek and maintenance to address it. Yet defendants have done nothing to eliminate plaintiff's exposure to gas and continue to pretend that plaintiff and several others who have filed complaints and grievances are simply imagining that they are being exposed to gas.

143. The deliberate indifference shown plaintiff is only moderately improved upon when it comes to the health and well-being of the officers and counselors who have to work in the units.[1]

144. Defendants' deliberate indifference poignantly reflects the sentiments of the late Michael Jackson: "All I wanna say is they don't give a damn about us."

145. Although defendants claim that the gas installation meets "all codes," they have refused to provide any verification of their claim or to even reveal what the codes specify, who inspected the installation or even when inspections occurred.

146. Plaintiff does not believe defendants' claims and given DOC's and JTVCC's penchant for playing very loose with the truth, this honorable court should be extremely skeptical about anything defendants assert.

147. Even if, by some miracle, the system did meet all code requirements, the fact that the gas continues to blow into the rooms and even to affect people on the outside with toxic fumes is indicative of the fact that DOC has failed to provide a healthful environment and has placed the health, safety and lives of prisoners, counselors and guards at risk.

148. DOC policy B-02 states that "The healthcare unit will work in conjunction with the facility administration to promote a healthy environment in which an offender can work, study, recreate, receive healthcare and be housed."

149. Like most nice-sounding Doc policies, this one is also more "spin" than reality.

---

[1] The offices in the W-IAC (Inmate Activity Center) where the counselors work are exposed to the same asbestos and toxic fumes that the inmates and guards are exposed to in W/1 (the living quarters).

34

150. Treatment Administrator Defendant Hosterman is required by his job specifications to inspect the buildings on a regular basis. The Essential Functions of the Correctional Treatment Administrator promulgated by the Office of Management and Budget/Human Resource Management indicate that a Treatment Administrator "Conducts quarterly inspections of all buildings for cleanliness, general living conditions and security." Defendant Hosterman has not conducted such an inspection during the quarter century that he has been JTVCC's Treatment Administrator.

## HEALTH & MEDICAL

151. The United States Constitution prohibits cruel and unusual punishment. The standard for that in the context of prison medical care is deliberate indifference. The Delaware Constitution requires that "proper regard shall be had for the healthcare of inmates." 11 Del. C. § 6536 states: "(a) the Department shall promulgate reasonable standards, and shall establish reasonable health, medical and dental services, for each institution, including preventive, diagnostic and therapeutic measures on both an out-patient and hospital basis for all types of patients.

152. "The nature and extent of such medical and dental services shall be determined by the Commissioner of Correction in consultation with the chief medical officer of the Department.

153. "The Department may authorize, under regulations, inmates to be taken, with or without guard, to a medical institution or facility outside the institution."

154. In February, 2015, plaintiff sustained an injury to his eye. There was no doctor on staff so the on duty nurses called Dr. Maureen Gay-Johnson and requested that she come to the prison and treat plaintiff's injured eye. Dr. Gay-Johnson declined and instead told the nurses to

35

handle it. They put a bandage over his eye, but told Dr. Gay-Johnson they believed he required stitches and also that they thought he might have a detached retina.

155. A day or two later, Dr. Gay-Johnson saw plaintiff and remarked that the nurses had done "a shitty job" on bandaging his eye and that if she had done it, there would be no scar. She refused to examine him for possible retina injury despite being told that he was seeing flashing lights. Instead, she tried to force him to take high blood pressure pills and when plaintiff declined, she, in retaliatory fashion and against the medical protocols, forced plaintiff to receive a psychological examination for having the audacity to question the medical wisdom of her pill pushing preoccupation over the injury sustained to his eye.

156. In May of 2015 plaintiff complained of seeing "floaters" within his field of vision and requested to see an ophthalmologist. Before Connections (which has the medical contract for DOC) would send him to an ophthalmologist, they insisted that he see an optometrist. The optometrist put him in to see an ophthalmologist. Soon afterwards a second doctor put him in to see an ophthalmologist. When he was finally taken out, ostensibly to see an ophthalmologist, at the Delaware Eye Center, instead of seeing one, he was seen by yet another optometrist, a Dr. Andrew Berman. This amounted to months delay in seeing a professional who could diagnose and treat plaintiff's injury in a situation that is extremely time sensitive. Professional medical manuals state that possible retinal detachment should be treated within two days, yet plaintiff has gone since February 2015 without treatment.

157. at one point Dr. Berman said plaintiff had a "detached retina, not a torn retina." Then, after he reported his findings to a superior, he backtracked and said plaintiff had neither, but he did refer plaintiff to a retina specialist.

36

158. Dr. Berman put in a consult for plaintiff to see a retina specialist. But he has not yet been seen by an ophthalmologist. Plaintiff was taken to see Dr. Paula Ko, who is not an ophthalmologist but is a retina specialist employed at Eye Physicians and Surgeons who told plaintiff that nothing was wrong with his eye. However, in a report she wrote for Connections at JTVCC, she indicated that plaintiff suffered from "vitreous detachment." During her examination, Dr. Ko discovered that plaintiff had at least two cataracts. Since cataracts had hide a retinal tear or detachment, the proper protocol in that situation is to give the patient an ultrasound examination. Plaintiff requested that Dr. Ko examine his eye with ultrasound. Dr. Ko became indignant and said, "I am the doctor, not you and if I say you don't have a retinal detachment, then you don't."

159. Vitreous detachment, if that is all plaintiff suffers, can become a full retinal detachment, but it is still not clear whether or not plaintiff suffers from a detached retina, torn retina or some other eye injury since he was never seen by an ophthalmologist who is qualified to diagnose that true nature of his injury.

160. Plaintiff's vision has deteriorated and the floater, which had only been one, has multiplied so that he currently suffers from several vision obscuring floaters plus lines that cross and obscure his vision.

161. Defendants' failure to provide timely, proper and accurate diagnosis and treatment for plaintiff's eye injury demonstrates deliberate indifference in violation of the Eighth Amendment to the U.S. Constitution as well as violation of Delaware's Constitution and relevant statutes. 11 Del. C. § 6536 states that "The Department promulgate reasonable standards, and shall establish reasonable health, medical and dental services, for each institution, including preventative, diagnostic and therapeutic measures on both an out-patient and hospital basis for all

types of patients. ...The Department may authorize, under regulations, inmates to be taken, with or without a guard, to a medical institution or facility outside the institution."

162.  According to 11 Del. C. § 6517 the Commissioner is responsible for "Administering the medical/treatment service contract, or appointing a designee to administer the medical/treatment contract."

163.  Delay or denial of eye care, if sufficiently serious, is a violation of the Constitution. *Kersh v. Derozier*, 851 F.2d 1509.

164.  Plaintiff was put in twice for consults with an ophthalmologist, once by the contracted optometrist (not Dr. Berman) and once by Dr. Adeze Udeze.

165.  Prison officials were obligated to provide the twice recommended ophthalmological consult and not to substitute a consult with Dr. Ko, a non-ophthalmologist, in place of the requested consult from two medical doctors.

166.  Prisoners have a right to see and be treated by medical specialists and when such consults are made by medical professionals but not provided by prison officials, that is grounds for a claim of deliberate indifference.

167.  The Commissioner is also responsible for appointing the Medical Bureau Chief. Acting under color of state law, Defendant Coupe, Bureau Chief Kline, Connections, Dr. Markowitz, Dr. Berman, Dr. Ko and Connections Director Lesley Sexton have individually and jointly violated plaintiff's medical rights under the U.S. Constitution, Delaware Constitution, and state law.

168.  Plaintiff has suffered from shortness of breath and respiratory ailments due, he believes, to exposure to asbestos and mold.

169. Defendants' failure to remove or address the causes of his respiratory problems displays deliberate indifference.

*FOOD AND GMO EXPERIMENTAL DIET*

170. Prisoners may not be subjected to experimentation, even for medical research, without their consent.

171. Plaintiff is subjected to a prison diet that is extremely unhealthy and has been so subjected for forty years. Although defendant falsely classify the diet to be "heart healthy," it is anything but that. It is a diet of almost 100% processed food processed meat, starches and carbohydrates, replete with far more sugar and salt than the pancreas can process via insulin production thus subjecting him to the dangers of cancer, diabetes, hypertension and heart disease.

172. Scientific studies have shown that a diet with a high degree of processed meats causes cancer. All of the met served at Vaughn is processed.

173. The prison commissary is such that it could not be worse if it were purposely designed to kill prisoners. It provides nearly zero healthy food choices. It serves no vegetables and next to no dry or fresh fruit. It is full of nothing but sugary treats, snacks, candies, pastries and heavily salted foods and chips that contain MSG, high fructose corn syrup and a plethora of disease, diabetes and cancer causing substances.

174. Prevailing law and regulations prohibits using prisoners as guinea pigs in experiments without their consent. Genetically Modified Organisms (GMO) foods are experimental and have never been proven scientifically to be safe for human consumption. The one long-term, large study showed that GMOs caused huge cancerous tumors in rats, some of the tumors were as large as the rest of the rats' entire bodies.

175.  Most of the food plaintiff is forced to eat has been genetically modified including but not limited to the corn, rice, soy beans and wheat.  Subjecting plaintiff to potentially cancer causing Monsanto-DuPont GMO food is violative of his right not to be subjected to cruel and unusual punishment as well as a violation of his right not to be experimented upon by mad scientists or the corporations which employ and subsidize them.

176.  Unlike people in the outside world who can exercise their choice to purchase organic food, plaintiff is wholly dependent upon whatever food his jailers provide or sell him.

177.  Plaintiff has no option but to eat the poison GMO food forced upon him since he is not permitted to select any other food and defendants do not provide or sell organic food and will not permit plaintiff's friends and family members to provide non-poisonous food for him.

178.  While subjection to such horrendous food consumption conditions for a short period might not amount to cruel and unusual punishment, being forced to consume nothing but processed food and GMO poison food for one's entire life certainly is.

179.  Defendants have displayed deliberate indifference to plaintiff's plight by failing to act upon his many letters, grievances and requests to be provided with alternatives to the poison food he has been forced to \consume.

180.  One tenet of plaintiff's Fitrah religion is the avoidance of GMO food and non-organic food in much the same way that Kosher Jews and Muslims avoid pork.

### BOOKS UNDER THE RLUIPA

181.  Plaintiff's Fitrah religion requires him to read four books per day or25 books per week that are related to African Traditional Spirituality or those systems (such as Taoism and Yoga) which derive from it.

182.  The U.S. Circuit Court for the Third Circuit found in favor of a similarly situated inmate I the case of *Washington v. Klem*, 497 f.3d 272.  Defendants have denied plaintiff his right to read the number of books he needs to read to practice his religion in denial of his rights under the RLUIPA.  Moreover, the Vaughn prison's three book rule violates even the Department of Correction's policy that prisoners be allowed to have seven books in their possession at a time.

183.  The JTVCC administrators have sought to curtail the seven book allowance by DOC by restricting the amount of books to three books, two magazines, and two newspapers.

184.  Plaintiff has never in forty years met a prisoner who subscribes to two newspapers a day and two magazines a month.

185.  The Vaughn prison's corruption of the seven book allowance amounts to an outside-the-policy limitation to three books when the DOC policy permits seven.

186.  Plaintiff and any practitioner of Fitrah must consult, on a regular basis, books on oracles such as *Ifa Divination* and *I Ching*, books on Kemitic religious practices such as *Metu Neter, Volumes 1 through 7*, astrology books which require at least three books such as an ephemeris, a Table of Houses, and a book on chart construction and delineation such as *Llewellyn's Astrology A to Z*, books on Chi Kung, the Pert Em Hru (Egyptian Book of the Dead), which is the primary scripture of ancient Egypt, books on Egyptian language and hieroglyphics, books on Kabbalah and magical rituals, books by scholars of Fitrah-based religions and books on African Spirituality such as *Odu Ifa* and *The Husia* by Dr. Maulana Ron Karenga and books by Dr. Muata Ashby.  In addition, since Fitrans believe that Fitrah is compatible with science, he must refer to and study some scientific texts.  For example, the 11 dimensions or spheres of the

Paut Neteru (Tree of Life) is the basis of modern scientific String Theory which posits ill universes or worlds that are interconnected.

187. To plaintiff and any Fitrah adherent, organs and zones of the body are linked to or are microcosms of planetary and stellar forces and will therefore consult texts relating to the microcosm to gain insight into the microcosm. For example, the kidneys are under the governance of the planet Venus in astrology. Venus is referred to as the goddess Het-Heru (Hathor) in Kemitic psychobiological symbolic science or so-called "myth." That energy is encoded as Mary Magdalene and Hagar in Judeo-Christian texts. Thus a Fitran who is experiencing any kind of kidney issue might consult the myths pertaining to any of these scriptural variables (archetypes) to stimulate his or her intuitive faculty to provide some guidance or insight into how to seek a proper remedy for his or her condition. He would also seek to determine the location of Venus in the sky at present and the location of Venus in his natal chart and by making appropriate offerings and performing appropriate Venusian rites at the right time, he would improve the probability of successfully invoking Venusian energy for the healing of his kidneys or the healing of his marriage or the improvement of his finances, depending upon the situation at hand.

188. Consultation of the proper books is as significant to a Fitran as the consultation of the appropriate case law and expert opinions would be to an attorney or the appropriate medical texts would be to a doctor.

189. For a Fitran, 25 books per week is not a luxury, but a necessity.

190. Access to the prison book library is not adequate since, under Defendant Hosterman's rules, one can only visit the library once every fortnight and can only obtain three

books at a time then.  Nor does the prison library stock or hold the range of literature a practicing Fitran requires to practice his religion.

191.  Some of plaintiff's writings on Fitrah can be found at www.amirfatir.com.  Since Fitrah is believed by its adherents to be the source of many derived systems of religion, plaintiff has endeavored to explain the deeper, healing prescriptions within various religions under the categories Christian Fitrah, Sumerian Fitrah, Astrological Fitrah, Islamic Fitrah, Egyptian Fitrah, Fitrah Magic and Fitrah Yoga.

### VISITING

192.  Visiting is a statutory right and a right provided by policy.  It is also established by the Inmate Reference Manual, which has the same effect as statute.

193.  Policy and long-standing practice has been that a visitor who travels from beyond a 100 mile radius is entitled to a special visit, which consists of the 90 minutes each prisoner is allotted per week plus an additional 90 minutes.

194.  Defendants have refused to provide plaintiff and his wife with a special visit when she travels to visit him all the way from England.  And in several instances defendants have refused to even provide the 90 minutes all prisoners are allotted and have only given him 45 minutes.  Plaintiff believes this deliberate act of curtailing even the 90 minutes has been done maliciously to retaliate upon him for grieving and complaining about defendants' refusal to allot him and his wife the aforementioned three hour special visit to which he is entitled.

195.  On one occasion the prison visiting room staff claimed plaintiff's wife was "one minute late" (i.e., 29 minutes before the visit was to begin) and refused to allow her to visit despite the fact that she had travelled such a distance and had spent thousands of dollars in plane and hotel expenses to visit her husband.

196. the prison has claimed it has given plaintiff special visits of 90 minutes by simply providing the same visiting time and then claiming it to be a "special visit." The computer generated visiting list, however, neglected to go along with the ruse and continued to list his so-called special visit as the "Regular Visit" that it was.

197. The so-called special visits of 90 minutes provided to plaintiff are in lieu of his regular visit time so he gets the same visit that one who get if his visitor traveled from down the street in Smyrna – as some visitors do.

198. Defendants' refusal to provide a special visit or even the full regular visiting time violates plaintiff's first amendment right to freedom of assembly as well as the Department's own stated goal of maintaining family bonds and ties. It also violates DOC practice and policy.

199. Defendants Sgt. Steven Floyd and Sgt. Boston-Clark used the false "one minute late" ruse to deny plaintiff's son from visiting him on February 4, 2016. In all probability, this ruse was used to retaliate against plaintiff for asking for his rights and for the visiting room to adhere to prison policy in several areas.

### *ACCESS TO THE INTERNET*

200. "The U.S. Supreme Court looks to the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958).

201. Under that doctrine and the absence of an iron curtain separating rights outside the prison from those within the prison, plaintiff asserts his right of access to the internet, including but not limited to emails, and eBooks,

202. Prisons are not permitted to charge prisoners for security-related functions and activities. The cost of an email is considerably less than that of snail mail. For plaintiff to write

44

a letter he must pay at least $0.53 (stamp and envelope, not counting the cost of paper). The cost of writing to his wife in England or other family and friends overseas is $1.19 postage and envelope. If the prison is going to deny his right to send emails, it should at least take up the extra cost of forcing him to sue snail mail.

203. The world communicates by texting and emails. It runs counter to the DOC's stated goal of preparing prisoners for the community and maintaining familial relations to prohibit the use of email and access to the internet.

204. Many prisons have allowed prisoners to access the internet and emails and have sold tablets in the prison commissary to facilitate that access. Although Delaware prisons are decades behind the times in almost every rea of corrections and rehabilitation, that is not a sufficient excuse to deny a Constitutional right provided by the First Amendment.

205. Plaintiff is a published writer whose ability to get published has been sorely curtailed by being limited by his jailers to 17th Century modes of communication. Vaughn is a prison that has yet to allow prisoners to even use a typewriter unless they can squeeze into the prison law library for an hour to three per week. Vaughn even attempts to limit prisoners to two ink pens and a mere 20 stamps.

206. Absent an order from a federal court Vaughn prison will remain stuck in 17th Century ideas and practices and will limit prisoners' rights accordingly.

### *DOC & GTL RIP OFF*

207. As a ward of the state, plaintiff has an expectation that his jailers would negotiate contracts that are not to his detriment and that they would not cause him to pay for services that he, because of their conduct, cannot receive.

208. the phone contract with Global Tel* Link ("GTL") charged plaintiff for 15 minutes of phone time, but the Vaughn prison cut his calls off after 10 minutes. For each call made, defendants denied plaintiff 1/3 of the telephone time for which he paid.

209. Defendants have violated plaintiff's First, Fourth and Fourteenth Amendment rights. They were made aware of the overcharging practice by plaintiff and other inmates but denied the overcharging and did not take action to provide the 15 minutes of phone time it contracted with GTL to provide.

210. Courts and standard-setting bodies have held that inmate have a constitutional right to access telephones for keeping in contact with their families and friends. "Telephone access to the outside world is good for inmate morale, helps lessen stress, [and] helps maintain relationships." *Owens-El v. Robinson*, 442 F. Supp. 1368, 1386 (W.D. Pa. 1978).

211. GTL and DOC have charged plaintiff and other similarly situated JTVCC prisoners for 15 minute calls for calls that actually only lasted for 10 minutes. GTL indicated that the change to 15-minute calls was to have gone into effect on 10/21/15 in accordance with a "new" contract with DOC. The fault is DOC's, according to GTL, that plaintiff paid for 15 minute calls but only received 10 minute calls.

212. However, DOC blamed GTL for the failure to provide the contracted-for 15-minute calls.

213. In a letter to plaintiff from GTL Billing Services Support, Janice Altmon Brazile wrote: "In my investigation of your situation the PIN number 137010 on was set for 10 minutes and when they changed your Pin to 00137010 they should have changed your time frame for talking to 15 minutes. Unfortunately, that is not a GTL error."

214. The Federal Communications Commission stated that communicating via telephone reduces recidivism and stated its goal is to encourage such communication.

215. GTL's and DOC's charging for phone time that plaintiff did not receive obstructed the FCC's stated goals.

216. Plaintiff is a ward of the state. Therefore, DOC has a duty to assure that its ward is not charged unjustly by companies with whom it contracts, purportedly to provide and facilitate the rights of its wards.

217. As the vendor for telephone access in DOC, GTL is similar to a state agency and has a duty to provide the full services it's been paid to provide. After plaintiff made GTL aware of the overcharging, GTL continued to collect money for 15 minute calls until March 8, 2016.

218. DOC failed to increase the phone time to 15 minutes, but instead continued to cut off calls after 10 minutes.

219. The federal court has jurisdiction over this matter pursuant to the 1st, 4th 5th and 14th Amendments to the U.S. Constitution as well as the Commerce Clause of Article I, section 8, clause 3 which holds that "Congress shall have Power to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

220. Any contract DOC enters into that affects the moneys belonging to its wards has to be entered into for the benefit of its wards and not for the financial benefit of DOC bureaucrats and officials via such things as kickbacks. Delaware prison officials received in excess of $1,000,000 in kickbacks called euphemistically "commissions" from GTL per year. DOC has ignored its fiduciary duty to plaintiff and all similarly situated prisoners.

221. No state agency is permitted to run a profit making business which, under the guise of providing phone service to prisoners, DOC has done. Such a kickback relationship between government and corporations is truly fascism.

222. Governments can only lawfully obtain money via taxes and its departments and agencies have portions of those tax dollars allocated to them via the budgetary process. There is no lawful manner for state bureaucrats to enrich themselves to the tune of millions by receiving "commissions" (i.e. kickbacks) while they are still occupying positions of trust as alleged "public servants."

223. All kickbacks received by DOC/JTVCC should be returned to prisoners and this court should refer the practice to the Department of Justice for criminal investigation and possible violation of the RICO Act.

### GOVERNOR'S RIGHT TO GRANT SENTENCE COMMUTATION

224. The Delaware Constitution states that the governor can only grant a pardon or reprieve of more than six months after an applicant has been recommended by a majority of the Board of Pardons.

225. Plaintiff seeks declaratory judgment that he is not required by the Constitution to obtain such a recommendation for the same sentence and offense more than once.

226. Although the Constitution only requires a single favorable recommendation, the prison system and other agencies have fallen into the practice of requiring an applicant to get more favorable recommendations if the first one was not signed by the governor.

227. Plaintiff received a 4 to 0 favorable recommendation from the Delaware Pardon Board to have his sentence commuted to life with parole on December 19, 1991.

228. He seeks this court's declaratory judgment to protect his Constitutional right to petition government for the redress of grievances and his due process rights.

229. He seeks to invoke this court's power to affirm the governor's right to consider commutations of sentence of applicants who have obtained a favorable recommendation without having to wait (often years) for them to go back through a process whose constitutional and statutory requirements they have already met.

230. The repeated requirement of repeated applications to the Pardon Board after a favorable recommendation is not required by either the Delaware or United States Constitution.

231. Article VII of the Delaware Constitution of 1897 states that "The Governor shall have power to remit fines and forfeitures and to grant reprieves, commutations of sentence and pardons, except in cases of impeachment; but no pardon, or reprieve for more than six months, shall be granted, nor sentence commuted, except upon the recommendation in writing of a majority of the Board of Pardons after full hearing; and such recommendation, with the reasons therefore at length, shall be filed and recorded in the office of the Secretary of State, who shall forthwith notify the Governor thereof.

232. "He or she shall fully set forth in writing the grounds of all reprieves, pardons and remissions, to be entered in the register of his or her official acts and laid before the General Assembly at its next session."

233. Nothing in the Delaware Constitution requires that plaintiff obtain a second, third, or fourth recommendation in order for the governor to act upon his request.

234. Forcing plaintiff, outside of Constitutional authority, to repeatedly seek recommendations after having already received one violates his rights under the 5th, 8th, and 14th Amendments to the U.S. Constitution and his rights under the Delaware Constitution.

235.  Plaintiff has made formal applications and requests by letter to Governor Markell and his counsel to commute his sentence pursuant to the powers granted by the Delaware Constitution.

236.  Plaintiff made his applications and requests on February 3, 2012 and June 21, 2013 by letter to Andrew H. Lippstone, the Governor's Counsel.  On July 9, 2014 he petitioned Governor Markell and on January 8, 2016 he filed a Direct Application for Commutation Pursuant to Art. VII, Sec. 1 of the Delaware Constitution.  In all of his filings he cited the relevant constitutional authority.

237.  Governor Markell has never responded nor acted upon plaintiff's applications and requests.

238.  This issue is therefore ripe for this court to decide.

## *FORCED SIGNING OF BLAND CHECK TO EXERCISE FIRST AMENDMENT MAILING RIGHTS*

239.  DOC at Vaughn prison forces plaintiff to sign a blank check called a "Pay To" in order to exercise his right to mail letters and packages that cost more than $0.49.  In many instances, the mail room staff overcharges plaintiff and similarly situated prisoners exorbitantly, and refuses to properly weigh packages and other mail.

240.  Plaintiff has complained to the people who are supposed to protect his interests – Support Services Manager Tonya Smith, Support Services Officer Carol Powell, and the mailroom supervisor – but his complaints have fallen upon deaf ears.

241.  Plaintiff has a right to utilize the mail system and that right includes having his packages and letters properly weighed and verified that he is not being overcharged due to officers' negligence, laziness, ignorance, malfeasance, or deliberate indifference.

242. JTVCC mailroom staff refused to mail out materials unless plaintiff signed a blank check that permitted them to place any amount of money whatsoever on the voucher check, even completely depleting his account. That would leave plaintiff with no recourse or even ability to prove he was overcharged since the package would be gone and any court would have to weigh his contention against the mailroom officer's contention that the pre-paid package had been properly weighed and charged. In such instances, absent any evidence, few courts would give a prisoner's estimate that he was grossly overcharged equal weight with the assurance of a prison guard that he'd properly weighed and charged the prisoner.

243. Defendants have violated plaintiff's rights under the 1st, 4th, 5th and 14th amendments to the U.S. Constitution. Their overcharging blank check conduct is even more unconscionable in view of their policy-violating restriction of books to three (four less than DOC's 3.9 policy of seven books) which forces plaintiff (a voracious reader and prolific writer) to mail out packages of books to outside loved ones or else be forced to donate them under duress to the prison library.

244. There is no procedure in place that would prevent defendants from charging him $500 for a package that should only cost $2.00 and, after the money is deducted, plaintiff can do nothing to recoup his lost money.

245. The signing of a check for services amounts to a contract, however, defendants have forced plaintiff to sign and agree to illegal adhesion contracts in order to exercise his First Amendment right to access the postal system.

## *DENIAL OF TOILET FACILITIES*

246. For years defendants have denied plaintiff access to the bathroom or any toilet facilities during outside recreation. Plaintiff and others have complained and filed grievances,

but defendants have refused to permit them to return to the building to relieve themselves. This has caused several inmates to have to urinate outside and, when caught doing so, they have been written up and summarily moved to higher security.

247. One prisoner who was refused access to the toilet had no recourse but to pull down his pants and defecate right in the chow hall. Defendant Matthew Stevenson was in the chow hall. Defendant Carrothers arrived on the scene to investigate then summarily sent him to SHU Supermax to the hole in Building.

248. Paragraph 7 of the Delaware Correctional Center Inmate Reference Manual provides that the sanitary installations shall be adequate to enable every inmate to comply with the needs of nature when necessary and in a clean and decent manner.

249. Grievances on the lack of bathroom facilities have been met with sarcasm, ridicule and have been summarily dismissed.

250. Defendants' denial of toilet access is unconstitutional. *Gates v. Cook*, 376 F.3d 323, 340-41 (5th Cir. 2004); *Masonoff v. DuBois*, 336 F. Supp. 2d 54 (D. Mass. 2004); *Mitchell v. Newryder*, 245 F. Supp. 2d 200 (D. Me. 2003).

## *BOOKS AND PUBLICATIONS*

251. Defendants refused to permit plaintiff to receive two publications that were sent to him: *The Sexual Teachings of the White Tigress* and "The Body" edition of ESPN Magazine were rejected in violation of DOC policy 4.5 and DOC's settlement with Tightwad Magazines, Inc.

252. *The White Tigress* is a Taoist female sexual health book that meets several of 4.5's requirements and exceptions and the ESPN magazine was rejected without any explanation of what the mailroom guard decided was objectionable.

253. The criteria used to ban publications and books is arbitrary and capricious and is up to the whim of whichever often untrained officer happens to process the mail that day., There is no proper training on the meaning of policy 4.5 and the Warden's designee simply co-signs nearly every rejection that comes to him from the mailroom. Inmates refer to the designee as "Dr. No." because he has never yet been known to say "yes" to the entry of any publication that's been rejected by any guard.

254. Rejection of plaintiff's publications violates the First Amendment to the U.S. Constitution and Delaware's own Constitution.

### *STATUTORY AND MERITORIOUS GOOD TIME*

255. Good time credits are time removed from a prisoner's sentence for good behavior. The State of Delaware provides two categories of good time, statutory and meritorious. Statutory good time is time off that is automatically earned according to a set formula that a prisoner ears automatically. Meritorious Good Time credits are additional reductions form a prisoner's sentence based upon his or her participation in various program and activities such as employment, education, group therapy, treatment rehabilitation activities and some religious program activities.

256. The Inmate Reference Manual states: "According to Delaware Criminal Code if you are confined under sentence you may earn a reduction of the time of your confinement by demonstrating and maintaining a good conduct record. Thus, you accumulate 'good time', that is, time which will be deducted from your sentence, at the rate of 5 days per month for the first year; 7 days a month for the second year; 9 days a month for the third year; and 10 days a month for a month [sic] thereafter. This accumulated 'good time can be taken from you if you fail to

maintain a record of good conduct.  For additional information concerning this way of earn8ing

your 'good time', refer to Appendix 1 in the back of the manual."

257.  Appendix 1 provides a chart for earning statutory good time beginning rom 1 month

of incarceration up to 30 years.  In 30 years, a prisoner has earned 10,950 statutory good time

credits.

258.  "By 11 Del.C. § 4371, it is provided that a prisoner 'may merit diminution of his

confinement by his behavior, fidelity and compliance with the rules.' By § 4372, it is provided

that for good behavior, diminution of sentence shall be 5 days for each month 'commencing on

the first day of his arrival at the facility' until more than one year of the sentence has elapsed;

thereafter, the diminution shall be 7 days for each month until more than 2 years of the sentence

have elapsed; thereafter, 9 days monthly until more than 3 years have elapsed; thereafter, 10 days

per month until the end of the sentence. By § 4373, it is provided that previously allowed good

time may be forfeited by bad behavior and that any such forfeiture may be restored if the

Department so decides." *Nardini v. Willin*, 245 A.2d 154.

259.  IRM page I-1 also states:  "Within the next six months another method of gaining

'good time' hopefully will be in effect.  By this method it will be possible for an inmate to earn

up to 5 days additional good time for achievement and progress in an approved treatment

program, above and beyond that earned for his good behavior.  When this new legislation

becomes official and the administrative standards and criteria are worked out, an addition will be

made to this manual noting how you can earn 'achievement good time.'

260.  It is that "achievement good time" that became officially codified as Meritorious

Good Time.  The current version, codified at 11 Del. C. § 4381(c) states:  "'Good Time' may be

earned by participation in education, rehabilitation, work, or other programs as designated by the

Commissioner. Good time may be awarded for satisfactory participation in approved programs at a rate of up to 5 days per calendar month."

261. The applicable statutes governing plaintiff are found at Delaware Criminal Code Revised 1974.

### s. 4381. When diminution given.

A person committed to the Department may merit diminution of his confinement by his behavior, fidelity and compliance with the rules.

### s. 4381. Rate of reduction of confinement.

When a person has not been guilty of any violation of discipline or any rules of the department and has labored with diligence and fidelity, diminution of sentence shall be:

(1) For each month commencing on the first day of his arrival at the facility there will be a reduction of 5 days from the sentence;

(2) When more than 1 year of a sentence has elapsed, less the reduction of sentence as provided in subdivision (1) of this section, then from that time there shall be a reduction of 7 days for each month of the sentence;

(3) When more than 2 years of a sentence has elapsed, less the reduction of sentence as provided in subdivisions (1) and (2) of this section, then from that time there shall be a reduction of 9 days of each month of the sentence; and

(4) When 3 or more years of sentence has elapsed, less the reduction of sentence as provided in subdivisions (1)-(3) of this section,

then from that time there shall be a reduction of 10 days for each month of the sentence.

**s. 4384.  Reduction of confinement for rehabilitative achievement.**

An adult committed to the Department may earn reduction of his confinement by exemplary achievement in rehabilitation programs offered by the Department.  The Department shall publish regulations setting forth criteria for such persons to achieve reduction in confinement time.  No adult inmate may receive a reduction under this section unless he has shown satisfactory progress in a rehabilitation program approved by the Department.  No reduction of confinement shall exceed 5 days for each month of sentence imposed.  No reduction of confinement shall be granted until approved by the Secretary of Health and Social Services, who must give his approval to a reduction if he is satisfied that an adult inmate has satisfactorily progressed in an approved program of rehabilitation in accordance with regulations promulgated pursuant to this section.  Every adult inmate shall be given the opportunity to participate in an approved rehabilitation program subsequent to conviction, subject to limitations of time.

262.  Plaintiff was arrested on December 5, 1975 and given sentencing credit from December 12, 1975.  He received statutory good time up until the decision in *State v. Spence*, 367 A.2d 983 was applied to him and statutory good time was no longer provided.  However, *Johnson v. State*, 472 A.2d 1311 (Del. Supr. 1983) determined that retroactive application of *Richmond v. State*, 446 A. 2d 1091 (1982) which applied the *Spence* holding to good time

accrued before *Spence* was not tenable. "We hold that in the interest of fundamental fairness, the State's unilateral application of Richmond retrospectively to eliminate accrued 'good time credits' constitutes an 'ex post facto-like' violation of defendants' Fourteenth Amendment rights to due process."

263. Pursuant to *Johnson*, all statutory good time credits earned before *Spence* had to be provided.

264. Like the *Johnson* petitioners, plaintiff earned statutory good time credits before *Richmond*, but unlike those petitioners, the DOC failed to provide him with the credits he'd earned before the *Spence* ruling. By failing to apply the 45 days of statutory good time that was duly earned prior to *Spence*, defendants have denied him his due process rights under the Fourteenth Amendment.

265. Plaintiff continued to accrue Meritorious Good Time credits pursuant to 11 Del C. § 4384, however, defendants have grossly under calculated and miscalculated his Meritorious Good Time. Due to Departmental widespread dysfunction, particularly in the records keeping division, apathy, incompetence, and unprofessionalism, the DOC simply threw away all records of good time accrued prior to 2009.

266. A record of plaintiff's Meritorious Good Time accrued up to June 6, 1995 shows that he had earned 468 days.[1] Yet a decade later, the Records Division indicated that plaintiff had only earned a mere 334 days.

267. Plaintiff had worked, participated in approved programs and advanced his education for the entirety of his imprisonment, both within the Delaware prison system and during his time

---

[1] In reality, he had earned more as that calculation did not factor in the Good Time earned during his years Delaware transferred his to the federal prison system as a result of this court's order in *Anderson v. Redman*.

transferred out of state pursuant to the Interstate Corrections Compact. His actual Meritorious Good Time credit earned is over 2400 credits.

268. Despite letters and grievances seeking to have his record corrected and Good Time Credits restored, defendants have refused to credit him with the 2400-plus days of Meritorious Good Time he has earned.

269. Plaintiff therefore asks this court to order defendants to credit him with the good time, statutory and meritorious, he has earned and to reduce same from his sentence.

270. Department of Correction Policy 7.2 cites the policy's purpose to be "To establish an accurate and consistent system for recording and reporting statutory and meritorious good time credits." "To ensure proper statutes and procedures are utilized, Department and contract staff will provide precise and consistent recording of good time credits once the good time has been approved." "Statutory good time is provided by statue to all sentences for good behavior with the exception of those offenders sentenced to life under 11 Del. C. §4214 or 4204(k)."

271. The evidence will show that defendants have not established an accurate and consistent system and have not provided precise and consistent recording of good time that has been approved.

272. The exceptions for statutory good time provision is clearly stated to be limited to people sentenced to life under § 4214 or 4204(k). Plaintiff was sentenced under neither of those statutes, therefore denying him of good time he has earned is illegal.

## CLAIMS

Count 1

273. Winsette v. McGinnis, 617 F.2d 996 (3rd Cir. 1980) established that Delaware inmates have a protectable interest in work release and other programs available via the classification system.

274. On or about September 8, 2015 plaintiff had his annual classification hearing before the Multi-Disciplinary Team ("MDT"). The MDT consisted of Lt. Richard Porter and Counselor Kevin Fletcher. Plaintiff, who had worked outside/off-grounds at Central Supply Warehouse and Food Service Division for several years prior to a transfer to Arizona pursuant to the Interstate Corrections Compact, duly requested that the unit classification committee (MDT) consider his request to be re-classified, inter alia, to outside/off-grounds work status.

275. Plaintiff also requested that his requests be duly noted so that the appropriate classification boards (the Institution-Based Classification Committee ("IBCC"), the Central Institution Classification Committee ("CICC"), and Institutional Release Classification Board ("IRCB") could vote upon his requests.

276. Defendant Porter acknowledged that the programs to which plaintiff requested classification were "still on the books" and that they were "good programs that worked."

277. Defendants Porter and Fletch agreed to make a recommendation on plaintiff's request and to forward their recommendation to the IBCC, the next highest classification board.

278. Defendant Porter then wrote down what he purported was plaintiff's requests, however, the official record later failed to indicate plaintiff's requests or the MDT's positive or negative recommendation regarding his requests.

279. When plaintiff filed a grievance and appealed the de facto denial of his right to the classification process, he was informed by a letter from Classification Officer II Stacey Hollis to "discuss your requests with your unit counselor to come up with a consensus before your MDT."

280. Since plaintiff had already made his request at the MDT, Ms. Hollis' directive amounted to a denial of the requests he'd already made, but without affording him the process to which he is due.

281. There is no obligation that plaintiff "come up with a consensus before" the MDT hearing. The MDT is the first stage of classification and is the forum at which the inmate can make formal classification requests. At his prior MDT he had told Lt. Porter and his counselor that, at the next hearing (in 2015) he was going to officially request to be classified to the programs he did request classification to at the September 2015 hearing. Additionally, he notified that 2014 MDT that, at his next hearing he was "going to ask for everything I'm entitled to by law."

282. Plaintiff fulfilled what was required at step one of the classification process by duly making his requests. Defendants violated plaintiff's rights by failing to afford him the process by voting to either recommend or not recommend that his requests be granted and forward those positive or negative recommendations to the next classification board.

283. Plaintiff appealed the MDT classification's refusal to act upon his requests to Warden David Pierce who directed Classification Officer II Stacey Hollis to reply. Classification Officer Hollis wrote that plaintiff could not appeal and, inaccurately, wrote that "outside/off-grounds status, furlough, work release and education were not addressed at any of the classification levels (MDT, IBCC), so it cannot be appealed. Per classification policy, the only item that can be appealed is an increase in a security level."

284. In fact, outside/off-grounds status, furlough, work release and education were addressed at the MDT level.

285. On September 27, 2015 plaintiff filed a grievance on the MDT's failure to afford him the classification process, but that grievance was returned "not processed" per Cpl. Matthew Dutton. On October 9, 2015 plaintiff wrote Ms. Hollis to correct her misunderstanding that he had not raised the issues he was appealing at the MDT.

286. In early October, 2015, in a conversation outside L Building Ms. Hollis told plaintiff that she had referred the matter back to Warden Pierce since only he could order a re-classification to address the requests that should have been raised in the September 2015 classification.

287. A few days afterwards, plaintiff saw Defendant Porter in the W-Unit Inmate Activity Center (W-IAC). By then Defendant Porter had begun to change his tune and said he did not write down plaintiff's requests because "we don't give out those things anymore."

288. Defendants violated plaintiff's liberty interest in the classification process including his right to be considered for requests made at the MDT level for outside/off-grounds employment pursuant to 11 Del. C. §§ 6502, 6505, 6533, 6537, 6531, 6530, and the 1st, 5th, and 14th Amendments (including the privileges and immunities clause) to the United States Constitution, the Inmate Reference Manual ("IRM"), and DOC policies and procedures.

289. Defendants Coupe, Klein, Pierce, Brennan, Porter, Fletcher, Phelps, Hosterman, Scarborough, Parker, Evans and are responsible for the violations in this count.

## Count 2

290. Defendants deprived plaintiff's rights under the United States Constitution, the applicable version of 11 Del. C. § 6538, the IRM and DOC policy 3.3 by failing to consider his request to be classified to a furlough, a right to which he has a liberty interest.

291. The relevant version of 11 Del. C. § 6538 states that "the Department **shall** promulgate regulations under which inmates, as part of a program looking to their release from custody of the Department or their treatment may be granted temporary furloughs from the institution to visit their families or prospective employers."

292. Any later version of s. 6538 that might abridge or abrogate his right is irrelevant to this action and, if applied to him, would violate the ex post facto clause of the United States Constitution.

293. Plaintiff's invokes his right to furlough pursuant, inter alia, to 11 Del. C. §§ 6502, 6537, 6531, 6530, and 6538.

295. Defendants Coupe, Klein, Pierce, Brennan, Porter, Fletcher, Phelps, Hosterman, Scarborough, Parker, Evans and are responsible for the violations in this count.

## Count 3

296. Defendants violated plaintiff's right to the classification process to be considered for educational release pursuant to 11 Del. C. § 6533 and § 6533A which states: "The Department **shall** adopt rules and regulations governing the education of trustworthy inmates under the jurisdiction of the Department."

297. Plaintiff earned the status of a "trustworthy inmate" when the Department classified him to outside/off-grounds status, employed him to work outside the prison for several years, trusted him to create and manage numerous treatment programs, conduct seminars for colleges, recommended him repeatedly for parole and pardon, trusted him to conduct family therapy for families of prisoners, entrusted him to conduct tours of outside dignitaries, and entrusted him with the safety of Commissioner Robert Watson and Patricia Watson, the Commissioner's wife,

as well as judges and dignitaries such as Governors Tom Carper and Dale Wolf when they came to the prison to participate in programs created, managed, and supervised by plaintiff.

298. Moreover, plaintiff was trusted to conduct a seminar for new prosecutors and defense attorneys on behalf of Judge Bifferato, in his courtroom, along with attorneys Eugene J. Maurer, Jr. and Kevin J. O'Connell.

299. By denying him the classification process to educational release, defendants violated Delaware statutes, DOC policy, the due process clause of the 5th and 14th Amendments and the 14th Amendment's privileges and immunities clause.

300. Defendants Coupe, Klein, Pierce, Brennan, Porter, Fletcher, Phelps, Hosterman, Scarborough, Parker, Evans and are responsible for the violations in this count.

### Count 4

301. Plaintiff requested that he be classified to work release pursuant to 11 Del. C. § 6538 at his September 8, 2015 MDT classification.

302. Defendants failed to provide him with the classification process and procedures in violation of the due process clauses of the 5th and 14th Amendments, the privileges and immunities clause of the 14th Amendment, Delaware statute and the IRM. In addition, defendants have violated their contract with plaintiff and his resultant expectation of "gradual phasing" to which plaintiff was duly classified and enrolled by the Department.

303. Gradual Phasing is a program and classification process by which inmates who are selected and classified move from higher to lower security levels and activities and then phase into outside work, then off-grounds work, then work release and finally freedom.

304. Defendants Coupe, Klein, Pierce, Brennan, Porter, Fletcher, Phelps, Hosterman, Scarborough, Parker, Evans and are responsible for the violations in this count.

Count 5

305.  Defendants violated plaintiff's due process rights under the 5th and 14th

Amendments, state statute and, inter alia,  Department policy 3.3 by failing to provide him with

the classification process when he requested to be considered for an outside-the-institution

special visit, i.e., an escorted home visit pursuant to 11 Del. C. § 6537.

306.  In addition, defendants have violated their contract with plaintiff and his resultant

expectation of "gradual phasing" to which plaintiff was classified and enrolled by the DOC.

307.  Defendants Coupe, Klein, Pierce, Brennan, Porter, Fletcher, Phelps, Hosterman,

Scarborough, Parker, Evans and are responsible for the violations in this count.

Count 6

308.  Defendants' refusal to change plaintiff's religious designation from Islam to Fitrah

violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the

Delaware Constitution and DOC policies 5.1 and 5.2.

309.  Defendants Coupe, Pierce, Brennan,  Phelps, Hosterman, Parker, Klein,  Pennell,

Scarborough, Cristo, and Waters are responsible for the violations in this count.

Count 7

310.  Defendants have placed a substantial burden upon plaintiff in his effort to practice

his religion, in violation of the RLUIPA and have denied him the right to practice Fitrah in

violation of the First Amendment, the Delaware Constitution, and Department policy.

311.  Defendants Coupe, Pierce, Brennan,  Phelps, Hosterman, Parker, Klein,  Pennell,

Scarborough, Cristo, and Waters are responsible for the violations in this count.

Count 8

312. By refusing to process grievance #319522 defendants violated plaintiff's First Amendment right to petition government for the redress of grievances, right to practice his religion, and placed a substantial burden on plaintiff's religious practice in violation of the RLUIPA.

313. Defendants have also violated DOC policy 5.1, the Delaware Constitution's right to freedom of religion and the freedom of religion clause of the First Amendment to the U.S. Constitution.

314. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Dutton, Scarborough, Cristo, and Waters are responsible for the violations in this count.

### Count 9

315. In violation of the RLUIPA defendants have placed a substantial burden on plaintiff by requiring him to provide what they call "a bonafide outside source" for them to even consider his request to practice his religion. In so doing, defendants violated the RLUIPA's general rule that "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 2 of the civil Rights of Institutionalized Persons Act (42 USCA § 1997)."

316. Defendants refused to specify and failed to specify what they meant by a "bonafide outside source," or to establish any criteria for making said determination or to determine which individual or committee would judge any source's bonafides. Defendants thereby placed a substantial burden on plaintiff in violation of the RLUIPA, U.S. Constitution's First Amendment, Delaware Constitution and DOC policy.

317. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Rennout, Scarborough, Cristo, and Waters are responsible for the violations in this count.

Count 10

318. By requiring that plaintiff obtain permission from Wahhabi Imam Michael Waters – whose Wahhabi beliefs are ta people who believe and practice as plaintiff believes and practices are pagans who are legitimate targets for beheading and torture – to liberate himself from Islam, defendants imposed a substantial burden upon plaintiff in violation of the RLUIPA, required unconstitutional religious tests for plaintiff, and violated his rights under DOC policy, the First Amendment and the doctrine of separation of church and state.

319. Defendant Hosterman attempted to force plaintiff to submit to the religious dogma interpretation of Wahhabi Imam Waters and his discriminatory insult that plaintiff's religion "was not a religion."

320. Plaintiff's objection that Defendant Waters did not and has never represented him was rebuffed by Defendant Hosterman who ended any discussion with plaintiff over his religious practice because plaintiff declined to accept Defendant Waters as an expert judge on the validity of plaintiff's religion.

321. This action on the part of Defendant Hosterman with the collusion of Defendant Waters violates the IRM, A-13, which states that "if any inmate should object to a visit of any religious representative, his attitude shall be fully respected."

322. Plaintiff's attitude was not respected, it was ridiculed.

323. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Pennell, Scarborough, Cristo, and Waters are responsible for the violations in this count.

Count 11

324. Defendants violated plaintiff's right to practice his religion by denying him the right to obtain and utilize essential oils, which are required to invoke the neteru/orisha (deities), which

66

are conscious energy gestalts revered and communed with in African Traditional Religions such as Fitrah, Yoruba, Kemitic Ausarianism, and others.

325.  Similar oils are permitted to be used in various prisons as Muslim prayer oils but denied plaintiff even though the African Fitrah-based religions classified them in a scientific manner analogous to the classification of chemical on the Periodic Table thousands of years before Islam, Judaism, or Christianity even existed.

326.  Defendants Coupe, Pierce, Brennan,  Phelps, Hosterman, Parker, Klein,  ⟨ᴿᵉⁿᵒᵛⁿ⟩, Scarborough, Cristo, and Waters are responsible for the violations in this count.

## Count 12

327.  Defendants denied plaintiff his right to obtain and utilize oracular materials such as Metu Neter oracle cards, Ifa palm seeds, I Ching divination coins, and Tarot cards.

328.  In 1994 plaintiff and others were permitted to purchase Metu Neter and Tarot cards, but defendants later denied such cards while yet permitting inmates to purchase gambling cards such as poker and "straight decks" and even giving such gambling cards to prisoners for free.

329.  Defendants violated plaintiff's rights under the RLUIPA, First Amendment to the U.S. Constitution, Delaware Constitution and DOC policy.

330.  .  Defendants Coupe, Pierce, Brennan,  Phelps, Hosterman, Parker, Klein,  ⟨ᴿᵉⁿᵒᵛⁿ⟩, Scarborough, Cristo, and Waters are responsible for the violations in this count.

## Count 13

331.  The IRM, A-13, says that a qualified representative **shall** be allowed to hold regular services and pay pastoral visits.

332. Defendants refused to allow plaintiff to participate in Kemitic Yoruba Fitrah services, violating his rights under the RLUIPA, First Amendment to the U.S. Constitution, Delaware Constitution and DOC policy.

333. Defendants Coupe, Pierce, Brennan, ~~Porter~~, ~~Fletcher~~, Phelps, Hosterman, Klein, Crispo, Rennell, Scarborough, Parker, ~~Evans and~~ Wexless are responsible for the violations in this count.

Count 14

334. Defendant Hosterman directed plaintiff to have an outside source confirm plaintiff's religious practices. Plaintiff objected that such a requirement violated his religious rights under, inter alia, the RLUIPA and the First Amendment. Still, plaintiff sought to comply and wrote to Hosterman: "Since I do not have access to telephone directories, the internet or phone calls to sources, please direct the chaplain to assist me in contacting outside practitioners of African Traditional Religions."

335. Page 21 of the IRM states that "staff chaplains will also help you maintain or establish a meaningful relationship with community members."

336. Yet Defendant Hosterman's reply was: "No, the staff are not your researchers. You have all the resource you need in your ability to correspond with outside resources, and an abundance of time to pursue that. I will not entertain any further obfuscation on your part."

337. After requiring that plaintiff get an outside source to contact Defendant Hosterman to testify that plaintiff's religious beliefs required him to practice as he'd indicated, Defendants refused to provide him with a means of contacting such a source.

338. Christian and Muslim prisoners obtain the assistance of Defendants Waters, Cristo and Hosterman to address their needs. Moreover, it is the chaplain's duty to assist prisoners in exercising their religion. That duty is not just for prisoners who practice religions to which

defendants also adhere.

339. By refusing to provide a means by which plaintiff could satisfy the unconstitutional requirement they'd imposed upon him, defendants placed a substantial burden upon plaintiff, violated separation of church and state, violated the establishment clause and demonstrated religious bias in violation of the U.S. and Delaware Constitutions, DOC policy, and the RLUIPA.

340. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Cristo, and Waters are responsible for the violation(s) in this count.

## Count 15

341. Plaintiff's religion requires that he read four books per day or, at minimum, 25 books per week. Defendants have refused to allow him to have the required number of books in his room or access to a means by which he can satisfy his religious requirement.

342. Plaintiff is only permitted to visit the institution's library once every fortnight, therefore, defendants have imposed a substantial burden upon plaintiff's free exercise of his religion in violation of the RLUIPA and the landmark precedent-setting ruling by the Third Circuit in the case *Washington v. Klem*, 497 F.3d 272.

343. DOC's own policy permits seven books, but JTVCC has corrupted even that policy by altering it to limit plaintiff to three books, two magazines and two newspapers even though plaintiff subscribes to no newspapers or magazines and has never, in four decades of imprisonment known of any inmate who subscribes simultaneously to two newspapers and two magazines that he would covetously hold onto as property. Newspapers and magazines are throw away items, books are not.

344. JTVCC defendants have therefore curtailed the DOC permitted seven books to a paltry three in violation of DOC's own constitutionally objectionable book restriction policy.

345. Defendants' arbitrary restriction of religious books to three further violates the IRM, A-3, which states: "[E]very inmate **shall be allowed** to satisfy the needs of his religious life by attending the services provided in the institution **and having in his possession the books of religious observance and instruction of his denomination or beliefs."**

346. This Court has ruled that mandatory language such as "shall" used in the IRM has the same enforcement effect as statute.

347. "The IRM together with the numerous statutory provisions impose rather specific requirements on the operation of DCC.  To the extent the IRM contains mandatory language, it has the same effect as a statute.  See Jenkins v. Keve, C.A. 74-191 and Davidson v. Keve, C.A. 74-119 (D. Del. Sept. 20, 1974)." *Anderson v. Redman*, 429 F. Supp. 1105, 1119.

348. DCC stands for the Delaware Correctional Center, the former name of the JTVCC.

349. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

350. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Connell, Cristo, and Waters are responsible for the violation(s) in this count.

Count 16

351. Defendants refused to permit plaintiff to obtain a small altar for the practice of his religion.

352. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

353. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Connell, Cristo, and Waters are responsible for the violation(s) in this count.

Count 17

354. Defendants refused to permit plaintiff to obtain poster images of the deities of his religion and diagrams of chi (prana) flow.

355. Chi (life force energy) cultivation is a prerequisite practice is Fitrah as well as other Fitrah-oriented systems in which chi is encoded under such symbols (variables) as the Holy Spirit, Ra, Shekinah, Christ, Mother Kundalini, Queen of Sheba, Isis, Ashtoreth, etc.

356. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

357. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Rennell, Cristo, and Waters are responsible for the violation(s) in this count.

## Count 18

358. Defendants refused to permit plaintiff to obtain, listen to and/or view DVDs and tapes of Kemitic Yoruba priests, initiates, babalawos, hemets (prophets), and scholars.

359. Defendants show Saudi Arabian Wahhabi sect DVD's Protestant DVDs and Catholic DVDs on the prison channel and have allowed prisoners of those faiths to go to the chapel to listen to and watch more of the same.

360. Defendants have permitted select practitioners of the two state sponsored religions (Wahhabism and Protestantism) to have cassette tapes and recorders in their rooms to listen to tapes of lectures by Imams and Reverends. Yet they refuse to accord plaintiff the same right of access to the lectures made by teachers of his religion.

361. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

362. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Rennell, Cristo, and Waters are responsible for the violation(s) in this count.

Count 19

363. Defendants have refused to allow plaintiff to attend classes conducted by practitioners of his religion, but allow Muslims and Christians to do so.

364. Defendants' actions violate the IRM, A-13, which states: "(1) If the institution contains a number of inmates o the same religion, a qualified representative of that religion shall be appointed or approved. If the number of inmates justifies it and conditions permit, the arrangements should be on a full-time basis. (2) A qualified representative appointed or approved under paragraph (1) shall be allowed to hold regular services and pay pastoral visits in private to inmates at proper times. (3) Access to a qualified representative of any religion shall not be refused to any inmate. On the other hand, if any inmate should object to a visit of any religious representative, his attitude shall be fully respected. (4) So far as practicable, every inmate shall be allowed to satisfy the needs of his religious life by attending the services provided in the institution and having in his possession the books of his religious observance and instruction of his denomination or beliefs. While in punitive segregation he will be permitted to see his religious advisor and have in his possession his books of religious instruction."

365. Plaintiff is not in punitive segregation. He is in Minimum Security. Yet plaintiffs deny him the accommodations that they are required by the IRM to provide even to those inmates who are held in segregation (also known as "isolation" and "the hole").

366. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

367. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, Pennell, Cristo, and Waters are responsible for the violation(s) in this count.

Count 20

368. Defendants have refused to allow plaintiff to undergo the initiatory rites, processes and ceremonies of Kemitic Yoruba Fitrah.

369. Initiation is extremely important in plaintiff's religion and is somewhat analogous to attending and completing graduate school in secular education.

370. A Fitran might need various Yoruba training and initiations to qualify to read and interpret the great Ifa oracle; he or she might require Ausarian Kemitic training and initiations to achieve mastery in entering states of trance, out-of-body projection or disengaging traumatic conditionings of his past which could be a source of his emotional or social difficulties today. He or she might seek initiations to the "graduate school" of Maat to fully comprehend the judicial system and how that system is ultimately rooted in divine order and to comprehend the deeper meanings of divine law as expressed through one of its vehicles, common (or case) law.

371. He or she might need to receive Reiki attunement (initiation) from a qualified Reiki master to perform healings of himself or others; he might seek initiations into the mysteries of the Goddess Het-Heru (Hathor) or Oshun to obtain divine assistance and guidance into healing his marriage or providing relationship happiness and fulfilment.

372. He or she might seek initiation into the "grad school" of Auset (Isis) to protect his or her children from gun violence or other social ailments and to facilitate their proper education, including acceptance into a good college.

373. Fitrah is a way of life that utilizes spiritual technologies that go far beyond the understanding of defendants' "two state religions" world view.

374. Plaintiff, however, should not be obstructed by either defendants' lack of knowledge nor their biases when it comes to exercising his rights to practice his religion.

375. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

376. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, ᑭᖿᓇᓇᓐᔅ Cristo, and Waters are responsible for the violation(s) in this count.

## Count 21

377. Defendants have refused to allow plaintiff to receive Kemitic Yoruba baptism, yet allow Christians to be baptized.

378. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

379. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, ᑭᖿᓇᓇᓐᔅ Cristo, and Waters are responsible for the violation(s) in this count.

## Count 22

380. Defendants have refused to permit plaintiff to conduct his worship with either small lamps or candles, yet permit Catholics to worship using candles.

381. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

382. Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, ᑭᖿᓇᓇᓐᔅ Cristo, and Waters are responsible for the violation(s) in this count.

## Count 23

383. Defendants have refused to permit plaintiff to obtain and wear Kemitc Yoruba jewelry, but permit Christians and Muslims to do so.

382. Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

383.  Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, (Connell), Cristo, and Waters are responsible for the violation(s) in this count.

Count 24

384.  Defendants have refused to allow plaintiff to obtain and wear Kemitic Yoruba Fitrah attire, yet permit Muslims, Jews, and Christians to do so.

385.  Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

386.  Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, (Connell), Cristo, and Waters are responsible for the violation(s) in this count.

Count 25

387.  Defendants have refused to allow plaintiff to receive ministerial/pastoral visits, in violation of the IRM, yet allow Muslims, Christians and Jews to do so.

388.  The IRM, A-13, says:  "A qualified representative… shall be allowed to hold regular services **and pay pastoral visits in private to inmates at proper times."**

389.  Defendants restrict this right to Muslims, Jews, and Christians and refuse this right to plaintiff who does not practice either of defendants' "state religions."

390.  Defendants have violated plaintiff's rights under the RLUIPA, the First Amendment to the U.S. Constitution, the Delaware Constitutions, DOC policy and the IRM.

391.  Defendants Coupe, Pierce, Brennan, Phelps, Hosterman, Parker, Klein, Scarborough, (Connell), Cristo, and Waters are responsible for the violation(s) in this count.

## Count 26

392. Defendants have exposed plaintiff to deadly, cancer-casing asbestos in violation of the Eighth Amendment, the Clean Air Act, the U.S. Constitution and Delaware's Constitution. See *Powell v. Lennon*, 914 F. 2d 1459.

393. Asbestos is under all of the times in W-Unit and is constantly inhaled by the prisoners who live within the building.

394. Plaintiff has lived in W-Unit from 1988-1996 and from 2007-present.

395. Defendants knew that plaintiff was exposed to asbestos, but did nothing to protect him by removing the asbestos from the housing unit.

396. Defendants' exposure of plaintiffs' to asbestos violates the 8th Amendment to the U.S. Constitution and demonstrates deliberate indifference to the hazard asbestos exposure poses to plaintiff's life and health.

397. Defendants Coupe, Phelps, Klein Pierce, Parker, Carrothers, Brennan, Hosterman, Kulhanek, Neeld, Wallis, Runyun, Stevenson, Burton, and Bilbrough are responsible for the violation(s) in this count.

## Count 27

398. W-Unit has repeatedly been infested with MRSA and scabies. Many in the population suffer from Hepatitis-C and tuberculosis as well as HIV/AIDS.

399. Yet proper cleaning supplies have been removed from the unit to cut costs in order to reallocate money legislated in the budget for inmate care to guards' overtime and other security-related "toys" beloved by guards such as guns, scanners and tear gas.

400. W-Unit provides no bleach, disinfectant, paper towels.

401. Defendants assigned Officer Runyun to W-Unit with the directive to further curtail on all cleaning supplies and to punish prisoners for even using the few cleaning supplies such as paper towels that can occasionally be obtained.

402. Such drastic curtailing of cleaning supplies puts plaintiff's health and potentially his life at risk and exposes him to the effects of deadly black mold in the showers, viruses on the tiers and in the bathrooms and is indicative of deliberate indifference in violation of the 8th Amendment to the U.S. Constitution and Delaware's Constitution as well as DOC policy and state statutes.

403. Defendants Coupe, Phelps, Klein Pierce, Parker, Carrothers, Brennan, Hosterman, Kulhanek, Neeld, Wallis, Runyun, Stevenson, Burton, and Bilbrough are responsible for the violation(s) in this count.

Count 28

404. Defendants have exposed plaintiff to toxic, noxious fumes from the gas emissions which have flown into W-Unit since the prisoner converted to natural gas in 2015.

405. That exposure places plaintiff's life and health at serious risk and, upon information and belief, already caused the death of another prisoner who lived on F-tier with plaintiff, Alberto Miranda.

406. Plaintiff's cell has no ventilation except for opening the window which, when opened, admits deadly, toxic gas.

407. Exposing inmates to toxic fumes has been ruled unlawful. See *Johnson-El v. Schomehl*, 878 f.2d 1043, 1054-55 (8th Cir. 1989); *Cody v. Hillard*, 599 F. Supp. 1025, 1032 (D.S.D. 1984), aff'd in part and rev'd in part on other grounds, 830 F.2d 912 (8th Cir. 1987).

408. Defendants exposure of plaintiff to toxic gas violates the Clean Air act, the 8th Amendment to the U.S. Constitution and Delaware's Constitution.

403. Defendants Coupe, Phelps, Klein Pierce, Parker, Carrothers, Brennan, Hosterman, Kulhanek, Neeld, Wallis, Runyun, Stevenson, Burton, and Bilbrough are responsible for the violation(s) in this count.

## Count 29

404. The prison showers on 11 of W Unit's 12 tiers, including F-tier where plaintiff is confined, contain deadly black mold and fungus which places plaintiff's health in peril.

405. Defendants' exposure of plaintiff to deadly mold and fungus violates the 8th Amendment to the U.S. Constitution and Delaware's Constitution.

406. Defendants Coupe, Phelps, Klein Pierce, Parker, Carrothers, Brennan, Hosterman, Kulhanek, Neeld, Wallis, Runyun, Stevenson, Burton, and Bilbrough are responsible for the violation(s) in this count.

## Count 30

407. Despite two approvals and requests by medical staff for plaintiff to be seen by an ophthalmologist, plaintiff was never seen by one.

408. Plaintiff's vision has become increasingly impaired and he may lose vision in his left eye because of the neglect and deliberate indifference of defendants.

409. Defendant Gay-Johnson refused to examine or treat plaintiff's eye on the evening it was injured or to provide any treatment for his eye when, later, she did see him.

410. After sustaining the injury, plaintiff saw flashes of light and then floaters before his vision.  The floaters increased to the point that his vision is severely obstructed and his eye constantly waters.

411. Professional publications such as the *Merck Manual* indicate that flashes of light and floaters following an injury could be a detached retina and that it should be treated by an

78

ophthalmologist within two days.  Plaintiff's injury occurred in February of 2015 and he has yet
to receive any treatment or be seen by an ophthalmologist.

412.  Defendants have violated plaintiff's right to protection against cruel and unusual
punishment in violation of the 8th Amendment and have shown deliberate indifference to
plaintiff's severe medical condition.

413.  Defendants Connections, Gay-Johnson, McCay, Coupe, Klein, Phelps, Richman,
Spraga, Pierce, Benedictis, Parker, Scarborough, Berman, Delaware Eye Care Center, Ko, Eye
Physicians and Surgeons, and Markowitz are responsible for the violation(s) in this count.

Count 31

414.  Plaintiff was taken out to the Delaware Eye Care Center to see an ophthalmologist,
but instead was seen (for the second time) by an optometrist after it had already been established
that an optometrist could not address plaintiff's eye injury.

415.  Dr. Gary I. Markowitz was contracted with the prison to provide ophthalmologist
service, but instead of seeing Markowitz or an ophthalmologist, plaintiff was seen by another
optometrist, Dr. Andrew Berman.

416.  Instead of referring him to an ophthalmologist, Defendant Berman referred him to a
retina specialist.

417.  This referral caused additional delays in the proper diagnosis and treatment of
plaintiff's eye injury and resulted in additional deterioration of his vision.

418.  Defendants have violated plaintiff's right to protection against cruel and unusual
punishment in violation of the 8th Amendment and have shown deliberate indifference to
plaintiff's severe medical condition.

419. Defendants Connections, Gay-Johnson, McCay, Coupe, Klein, Phelps, Richman, Spraga, Pierce, Benedictis, Parker, Scarborough, Berman, Delaware Eye Care Center, Ko, Eye Physicians and Surgeons, and Markowitz are responsible for the violation(s) in this count.

## Count 32

420. In September 2015 plaintiff was taken to Eye Physicians and Surgeons and was seen by Dr. Paula Ko, a retina specialist, who examined plaintiff's eye and said she found no retinal detachment.

421. However, she wrote that plaintiff had suffered "vitreous detachment," which she did not reveal to plaintiff but did put in his file to be read by the prison medical personnel.

422. Despite finding what she called vitreous detachment, Defendant Ko recommended no further treatment, examination or follow-up.

423. Dr. KO admitted that plaintiff had two cataracts. When cataracts are present during a retinal examination, but no detachment or tear is found by ophthalmoscope, the standard protocol is for the patient to be given an ultrasound examination since a cataract can make discovering retinal detachment impossible.

424. Plaintiff requested that Dr. Ko provide or recommend an ultrasound examination, but Defendant Ko became irate and indignant and refused to even discuss an ultrasound examination with plaintiff. "I," she proclaimed forcefully, "am a retina special, you're not. If I say you don't have a retinal detachment, then you don't. Period."

425. Defendants have violated plaintiff's right to protection against cruel and unusual punishment in violation of the 8th amendment and have shown deliberate indifference to plaintiff's severe medical condition.

426.  Plaintiff was twice referred by medical doctors to be seen by an ophthalmologist, but neither Defendant Berman nor Defendant Ko are ophthalmologists.  They were not qualified to address or treat his eye injury.  The 9th Circuit has found that rending of medical services by unqualified personnel is deliberate indifference.  *Toussaint v. McCarthy*, 801 F.2d 1080, 1112. *LeMarbe v. Wisneki*, 266 F.3d 429 (6th Cir. 2001) addressed a prison surgeon's failure to send a patient to a specialist.  Prison officials were cited for failing to provide, as with this plaintiff, specialty consultations.  *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704-05 (11th Cir. 1985).  See also *Wilson v. VanNatta*, 291 F.Supp. 2d 811, 816 (N.D. Ind. 2003).

427.  Courts have found prison officials to be deliberately indifferent when they failed to provide consults and treatment by specialists after they have been recommended or ordered by medical personnel.

428.  Plaintiff was both recommended and approved twice to be seen and treated by an ophthalmologist, but has not seen an ophthalmologist yet, despite several requests and grievances when those requests have proven fruitless.

429.  Defendants Connections, Gay-Johnson, McCay, Coupe, Klein, Phelps, Richman, Spraga, Pierce, Benedictis, Parker, Scarborough, Berman, Delaware Eye Care Center, Ko, Eye Physicians and Surgeons, and Markowitz are responsible for the violation(s) in this count.

Count 33

430.  The purpose of the Department of Correction is to return offenders to the community in a manner that allows them to live productive, law-abiding lives.  In an information age it is counterproductive to the Department's raison d'etre for it to prohibit plaintiff from utilizing basic information tools.

431. The Department has, itself, contemplated allowing such access, the only obstacle being that it hasn't quite figured out how it can profit from allowing inmates such access and how it can price gouge prisoners and their families via kickbacks from internet providers.

432. The usual catch all justification of "security" cannot be sustained in view of how many other prison in the United States – prisons with far greater security concerns than JTVCC – do allow internet access to prisoners.

433. Email costs a fraction of what snail mail, including paper and envelopes, costs. The Department's restriction of plaintiff to snail mail is costly to him as well as to the Department since snail mail must be checked for contraband and that requires employing several guards I the mailroom to check and sort incoming mail and to process outgoing mail.

434. However, if email were allowed, the amount of snail mail would be reduced to the point that the majority of mailroom officers could be re-deployed to other security functions.

435. By allowing plaintiff to purchase eBooks by utilizing technology such as Kindle, etc., any concern – real or contrived – that more than three books would amount to "a fire hazard" would be eradicated.[1]  Internet access could provide direct access to legal services such as Westlaw and Lexis which would greatly reduce plaintiff's and other prisoners' need to physically go to the prison law library since, at JTVCC, all legal materials must be read while physically sitting in the law library and cannot be taken out or copied to be read in one's room and such physical presence is only permitted from two to four hours per week, if one can get scheduled for a law library appointment.

---

[1] One wonders why it is not a fire hazard to have thousands of books in the prison library and thousands more in the prison law library, not to mention the hundreds that are in the prison education department.

436. Society is not static and the doctrine of "the evolving standards of decency" require that electronic communication access be viewed in the modern context with the same rationale as the right to pen, pencil, envelope and paper was viewed a century or more ago.

437. Defendants deny plaintiff access to the internet, email, eBooks and all electronic communications in violation of his First Amendment rights under the U.S. Constitution and his rights under the Constitution of the State of Delaware.

438. Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, and Hosterman are responsible for the violation(s) in this count.

## Count 34

439. Connections Medical and DOC require that plaintiff and other prisoners pay twice or thrice to receive treatment for medical ailments in violation of the intent of 11 Del. C. § 6536, the 4th and 8th Amendments to the U.S. Constitution and the Delaware Constitution.

440. Defendants Connections, Gay-Johnson, McCay, Coupe, Klein, Phelps, Richman, Spraga, Pierce, Benedictis, Parker, Scarborough, Sexton, and Laurie Ann Spraga are responsible for the violation(s) in this count.

## Count 35

441. Plaintiff was convicted before any law was passed or enacted requiring him to pay any fees whatsoever for medical visits.

442. Charging plaintiff any medical fees for visits violates the ex post facto clause of the U.S. Constitution as well as the 4th, 5th and 14th Amendments.

443. Defendants Connections, Gay-Johnson, McCay, Coupe, Klein, Phelps, Richman, Spraga, Pierce, Benedictis, Parker, Scarborough, Sexton, Powell, Smith and Spraga are responsible for the violation(s) in this count.

Count 36

444.  Before plaintiff can take his medical claims to court, he is required to go through the prison medical grievance procedure.

445.  DOC, however, places security guards such as Defendant Dutton inside the medical grievance which violates plaintiff's right to medical privacy under HIPPA.

446.  Defendants have refused to restrict Defendant Dutton and other security personnel from participating in medical grievances and thereby gaining access to plaintiff's medical records and information which can be, and usually is, shared with other guards if the information is either "juicy" or sensitive.  Guards often then share the same information with inmates they like or with inmates they don't like if they wish to harm or embarrass the inmate who might not wish to have his private medical information broadcast around the prison's gossip circles.

447.  Plaintiff has made defendants aware of this problem, but defendants have ignored his concerns.

448.  Defendants Connections, Dutton, McCay, Coupe, Klein, Phelps, Richman, Spraga, Pierce, Benedictis, Parker, Scarborough, Sexton, and Spraga are responsible for the violation(s) in this count.

Count 37

449.  Defendants prohibited plaintiff from receiving a book entitled *Sexual Secrets of the White Tigress*, a Taoist feminine health book.

450.  Defendants thus violated plaintiff's rights under the First Amendment to the U.S. Constitution, DOC's own policy 4.5.

451.  Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, Hosterman, Powell, and Smith are responsible for the violation(s) in this count.

Count 38

452.  Defendants prohibited plaintiff from receiving an edition of ESPN Magazine which was called "The Body."  Defendants thus violated plaintiff's rights under the First Amendment to the U.S. Constitution and DOC's own policy 4.5.

453.  Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, Hosterman, Powell, and Smith are responsible for the violation(s) in this count.

Count 39

454.  State Defendants and Defendant GTL negotiated and signed a contract to provide 15 minute calls to plaintiff and other prisoners, but instead of providing 15 minute calls, they only provided 10 minute calls but charged plaintiff for 15 minute calls.

455.  Both DOC and GTL were made aware of the overcharging and contractual violations.  DOC blamed GTL and GTL blamed DOC for the overcharging and contractual violations.

456.  Defendants Coupe, Phelps, Klein, Visali, Pierce, Parker, Scarborough, Brennan, Carrothers, and Hosterman are responsible for the violation(s) in this count.

Count 40

457.  Defendants force plaintiff to mail out packages such as books by signing a blank pay-to form (a voucher that results in the cutting of a check to deduct money from plaintiff's account).  Mailroom officers have repeatedly overcharged plaintiff and other prisoners.  Many officers who work in the mailroom, either full or part time, don't know how to weigh packages or how to determine rates based upon type of mail (such as Media, Book Rate, Parcel Post, Third Class, and Fourth Class) and the distance the package will travel.  Therefore, they just "guestimate" based upon First Class Mail rates and grossly overcharge prisoners, including

plaintiff, sometimes more than ten times the actual cost of mailing the package if it had been properly weighed.

458. A blank "pay to" is a voucher that authorizes defendants to deduct any amount they wish from plaintiff's account. Such a signed voucher amounts to a blank check which defendants have abused by inserting whatever amount they desire onto the pay-to.

459. By requiring that he sign a blank check in order to access the U.S. postal service, defendants have violated plaintiff's rights under the 1st, 4th, 5th and 14th Amendments as well as forcing plaintiff into adhesion contracts in order to utilize the U.S. mail.

460. Defendants are also in violation of 18 U.S.C. § 1726 which states: "Whoever, being a postmaster or other person authorized to receive the postage of mail matter, fraudulently demands or receives any rate of postage or gratuity or reward other than is provided by law for the postage of such mail matter, shall be fined under this title or imprisoned not more than six months, or both. "

461. Plaintiff requests that this court refer the matter of fraudulently charging plaintiff and many other prisoners in violation of section 1726 to the criminal division of the U.S. Justice Department for investigation and prosecution for mail fraud.

462. Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, Powell, and Smith are responsible for the violation(s) in this count.

## Count 41

463. Maintaining and strengthening family ties is an essential aspect of rehabilitation. Defendant Coupe has publicly spoken about his alleged commitment to maintaining and augmenting such familial ties among the prison population.

86

464. DOC and JTVCC policy is that people traveling from beyond a 100 mile radius are entitled to 90 minutes "special visit" in addition to their 90 minutes of regular visiting time, resulting in three hours of vesting time in all.

465. Defendants have repeatedly denied plaintiff special visits with his wife who travels from England. In some cases, plaintiff has only been afforded 45 minutes of visiting time with his wife and on others occasions defendants have claimed to give him 90 minutes "special visits" but have then refused to give him his allotted 90 minutes of "regular visit" time.

466. Delaware has the worst and shortest visiting time of any prison in the United States, as far as plaintiff has been able to ascertain. By contrast to Delaware's paltry 90 minutes of weekly visiting time, federal prisons such as Lewisburg permit 8 hours of visiting each day. Surrounding prisons in states like Pennsylvania and Maryland allow visits of at least seven hours and, in some cases, visitors can return for evening visits.

467. Delaware's Vaughn prison has no evening visits and allows two 45 minute visits per week and, in recent months, has even found many excuses to deny or curtail those visits by using excuses such as "lack of sufficient staff" or calling "code" exercises at the times when visits are scheduled to occur and family members have taken off work and traveled to the prison for visits they do not receive due to the whim of some drunk with supposed power guard.

468. Long practice and police have established plaintiff's right and expectation to no less than a three-hour special visit when his visitor travels from such a great distance as England or any distance that is greater than 100 miles away.

469. On one occasion plaintiff's wife allegedly arrived "one minute late" (which means she was there 29 minutes before the visiting time began as the prison arbitrarily requires visitors to arrive 30 minutes early) and defendants refused to allow her to visit. Such an unconscionable

act of callousness for a visitor who travelled all the way from England is compounded by the fact that every guard uses his or her own watch to decide what time it is and there I no standard time or clock used within the Vaughn prison. So the "one minute late" could have been according to the watch of a guard who'd set his or her watch 10 minutes early. Such unprofessional conduct and arrogance is commonplace in Vaughn.

470. By denying plaintiff special visits when his wife visits from England, defendants violated his 1st, 5th and 14th Amendment rights and his rights under state law and policy.

471. Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, Floyd and Clark-Boston are responsible for the violation(s) in this count.

## Count 42

472. The prison visiting room removed all the clocks so that plaintiff has to rely upon defendants' word and honesty to verify that he has even received the paltry 45 minutes of visiting time that the prison officially claims to provide.

473. In reality, plaintiff's visits have been regularly and repeatedly cut short such that he only receives 35 to 38 minutes of visiting time, especially when his visits are at 2:00 PM because the visiting room guards are eager to get out of the prison early, when they are supposed to depart their posts at 4:00 PM. After 2:45 PM, movement within the prison is supposed to be shut down ("Code Red"), so the visiting room guards, with the full knowledge of their superiors, cut visits short to get inmates searched and out of the visiting room area before 2:45 PM so the guards can rush out of the prison prior to the actual 4:00 PM shift change.

474. Each time plaintiff's visit was cut short he went to the clock in the visiting room hallway and verified that his visit had been shortened. When he complained about it, Defendants

had the hallway clock moved so that plaintiff and other prisoners could not see what the time actually when their visit was cut off was.

475. By denying plaintiff his full 45 minutes of visiting time defendants violated plaintiff's First, Fifth and Fourteenth Amendment rights and his rights under state law and DOC policy.

476. Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers2, Floyd and Clark-Boston are responsible for the violation(s) in this count.

### Count 43

477. On February 4, 2015 plaintiff was scheduled for two 45 minute visits. Sgt. S. Floyd, however, refused to allow plaintiff's visitor into the visiting room because, according to Defendant Floyd, the visitor was "one minute late."

478. "One minute late," even if true, actually means plaintiff's visitor was 29 minutes early since visitors simply wait in the area called "the Gate House" until the time for the visit begins.

479. Sgt. Floyd made plaintiff's visitor sit there in the Gate House for 75 minutes to have a truncated 45 minute visit simply because, according to Defendant Floyd's watch, the visitor was "one minute late."

480. There is no published policy that requires visitors to be 30 minutes early in order to exercise their right to visit at a prison their taxes support. The actual visiting policy is that visitors are to be admitted if they show up within 10 minutes after the visits have begun.

481. Although DOC is required to post changes in policy and procedure 30 days in advance before any changes are enforced, so policy change to the one cited in paragraph 480 has ever been posted.

482.  Instead, out-of-control guards, some of whom carry out personal vendettas by rejecting lawful visits, create capricious policies at whim.  The more superior defendants are well-aware of this pattern of abuse, yet have taken no actions to correct it.

482.  By denying plaintiff one of the two visits he was scheduled to have defendants violated plaintiff's First, Fifth and Fourteenth Amendment rights and his rights under state law and DOC policy.

476.  Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Carrothers, Powell, Floyd and Clark-Boston are responsible for the violation(s) in this count.

## Count 44

477.  Defendants are obligated to maintain and apply an accurate account of plaintiff's good time credits and to deduct same from plaintiff's sentence.

478.  Plaintiff earned statutory good time credits from the time of his arrest until the *State v. Spence*, 367 A.2d 983 decision.

479.  *Johnson v. State*, 472 A.2d 1311 (Del. Supr. 1983) established that eliminating the 45 days of statutory good time credits plaintiff earned prior to *Spence* would be "an ex post facto like" violation of plaintiff's Fourteenth Amendment right to due process.

480.  Defendants have violated plaintiff's Fifth and Fourteenth amendment due process rights by refusing and failing to apply his statutory good time credits to his life sentence.

481.  Defendants Coupe, Phelps, Klein, Pierce, Smith, Powell, Parker, Scarborough, Heath, Escherich, and McBride are responsible for the violation(s) in this count.

## Count 45

482.  Plaintiff earned Meritorious Good Time credits pursuant to 11 Del. C. § 4384, the statute that governed Meritorious Good Time credits for plaintiff.

483. Defendants have grossly miscalculated and under-calculated the Meritorious Good Time credits plaintiff has earned. Plaintiff has earned 2400 credits through December 2015, but defendants have recorded a mere 334 days of meritorious Good Time credits for plaintiff.

484. Defendants have violated plaintiff's Fifth and Fourteenth Amendment due process rights by refusing and failing to apply the additional 2066 Meritorious Good time credits to his life sentence.

485. Defendants Coupe, Phelps, Klein, Pierce, Smith, Powell, Parker, Scarborough, Heath, Escherich, and McBride are responsible for the violation(s) in this count.

Count 46
<sub>Kitchen and commissary</sub>

486. Defendants have subjected plaintiff to a diet comprised of mostly genetically modified (GMO) experimental food which has been scientifically proven to cause cancerous tumors in rats. This violates plaintiff's protection, as a prisoner, against being used as an experimental guinea pig against his will for biotech firms, pharmaceutical companies and large agricultural corporations.

487. By forcing plaintiff, without his consent, to consume a diet consisting mostly of GMO tumor-causing "Frankenstein" food, defendants have violated plaintiff's Constitutional protection against cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution.

488. Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Knight, Smith, Powell, Christenson, Ferretti, and Richman are responsible for the violation(s) in this count.

91

Count 47

kitchen and commissary

489.  Defendants have subjected plaintiff to a diet comprised of all processed meats and a

nearly 100% processed "fast food" diet.  Such diets have been proven to cause cancer and other

diseases such as high blood pressure, obesity, and diabetes.

490.  A study by the World Health Organization that was released 10/25/15 proved that

processed meats cause cancer.  The study was based upon a study of 34,000 processed meats.

491.  By forcing plaintiff to consume a diet consisting almost exclusively of processed

meats and fast food, defendants have violated plaintiff's 8th Amendment protection against cruel

and unusual punishment.

492.  Defendants Coupe, Phelps, Klein, Pierce, Parker, Scarborough, Brennan, Knight, Smith

Rowell

Christenson, Ferretti, and Richman are responsible for the violation(s) in this count.

Count 48

493.  The Delaware Constitution holds that a petitioner must receive a recommendation

from a majority of the members of the Board of Pardons before the governor can grant a pardon

or reprieve of more than six months.

494.  The Delaware Constitution does not require that a petitioner obtain a new

recommendation every time he petitions the governor if he or she has already been granted such

a recommendation during an appearance before the Pardon Board.  Nor does it require that a

petitioner obtain a new recommendation every time he petitions the governor.  Nor does it

require a majority vote from the Board of Pardons – or any vote whatsoever – for the governor to

grant a reprieve of less than six months.

495. Plaintiff received a 4 to 0 favorable recommendation for a sentence commutation on 12/19/91. The Secretary of State sent the recommendation to the governor.

496. Plaintiff petitioned Governor Jack Markell to act upon his recommendation. Governor Markell failed to act.

497. By requiring plaintiff to repeatedly seek Pardon Board recommendations for the same sentence after he has already obtained one such recommendation violates plaintiff's 1st Amendment right to petition government for the redress of grievances and his 5th and 14th Amendment rights to due process of law and Delaware' Constitution, Article I section 7.

498. Plaintiff seeks declaratory judgment that the Delaware Constitution does not require more than one positive recommendation; that he has the right to directly petition the governor for a sentence commutation in accordance with the 1991 recommendation and the Secretary of State's forwarding of same to the governor.

499. Plaintiff seeks declaratory judgment that states that plaintiff has the right to request and the governor has the right to grant a reprieve to plaintiff of less than 6 months from his life sentence without plaintiff having to obtain a positive recommendation from the Board of Pardons.

500. Defendant Markell is responsible for the violation(s) in this count.
Count 49

500a. Defendants refuse to allow plaintiff to use the toilet when he has gone outside for recreation forcing him and others to forego recreation or to sneak and urinate if they can. One prisoner was forced to drop his pants and defecate in the chow hall.

500b. Defendants Coupe, Pierce, Phelps, Scarborough, Parker,

93

Klein, Carrothers, Bilbrough, Stevenson, Burton, Runyun, and Brennan are responsible for the violation(s) in this count.

### Exhaustion of Administrative Remedies

501.  The plaintiff has exhausted his administrative remedies with respect to all claims and all defendants.

### Claims for Relief

WHEREFORE, plaintiff requests that the court grant the following relief:

Injunctive Relief

502.  Plaintiff seeks injunctive relief ordering defendants to classify him to furlough, work release, outside special visit, educational release, and outside/off-grounds employment.

503.  Plaintiff also requests the following in injunctive relief:

504.  Order defendants to change his religious designation from Islam to Fitrah.

505.  Provide Fitrah services.

506.  Provide or permit the purchase of oracle cards, Tarot cards, I Ching Coins, Ifa oracle palm seeds.

507.  Permit ministerial visits.

508.  Permit Fitrah classes.

509.  Enjoin defendants from requiring that plaintiff provide them with "a bonafide source," since there is no established criteria for what that is.

510.  Enjoin defendants from requiring plaintiff to get permission from Wahhabi Imam Waters or anyone else in order to change his religion from Islam to Fitrah.

511. Enjoin defendants from denying plaintiff's right to conduct and to participate in Kemitic Yoruba Fitrah services.

512.  Enjoin defendants from denying plaintiff's right to have outside Kemitic Yoruba priests, priestesses, and clergy conduct and participate in Kemitic Yoruba Fitrah services.

513.  Enjoin defendants from refusing to assist plaintiff in contacting Kemitic Yoruba priests, babalowas, mambos, clergy and hemets (prophets) as required by the IRM and DOC policy so those clergymen can assist in addressing plaintiff's religious needs and obligations.

514.  Enjoin defendants from denying plaintiff's right to possess and read 25 books per week or four books per day as required by his religion.

515.  Enjoin defendants from denying plaintiff's right to possess a small altar, posters of images of the deities of his faith, and posters the depict chi (energy) flow which, in Kemitic Yoruba Fitrah is the essence of the deity (neter) Ra who is incorrectly depicted as "the sun god" by supposed Egyptologists.

516.  Enjoin defendants from denying plaintiff's right to attend classes conducted by practitioners of Kemitic Yoruba Fitrah.

517.  Enjoin defendants from denying plaintiff from exercising his right to undergo initiation and to perform the initiations and ceremonies that are essential parts of initiation into higher experience of the Paut Neteru/Tree of Life which is the original African template of Western science's re-discovered String Theory.

518.  Enjoin defendants from denying plaintiff his right to receive Kemitic Yoruba baptism.

519.  Enjoin defendants from denying plaintiff his right to utilize candles – just as the Roman Catholics utilize – in Kemitic Yoruba Fitrah services, ceremonies and rituals.

520.  Enjoin defendants from forcing plaintiff to submit to Defendant Waters' Wahhabi religious dogma and his attempt to define plaintiff's religion.

521.  Enjoin defendants from denying plaintiff his right to obtain and wear Kemitic Yoruba jewelry (such as the ankh cross), headwear (as Muslims and Jews are permitted their religious caps).

522.  Order defendants to remove asbestos from all buildings at JTVCC where prisoners live, enter, or work, including the W-Building floor tiles.

523.  Order defendants to properly clean the buildings where prisoners live, enter or work by utilizing the proper cleaning supplies such as bleach, disinfectant, paper towels and others that kill HIV, MRSA, Hepatitis A,B, and C Tuberculosis and Scabies and, if defendants refuse to properly clean the facility themselves, for them to provide the appropriate cleaning supplies to prisoners.

524.  Enjoin defendants from prohibiting the use of paper towels, disinfectant, bleach for use in cleaning showers, toilets, urinals, sinks, cells and other areas where diseases are spread.

525.  Order defendants to stop the gas emissions from the chimney/exhaust and/or the boiler system from flowing into the rooms, forcing plaintiff and inmates to inhale toxic fumes.

526.  Order defendants to remove mold and fungus from the W-Unit showers and all showers in JTVCC where mold and fungus exist.

527.  Enjoin defendants from housing prisoners in W-Building which former Commissioner (now judge) Carl Danberg publicly stated was unfit for human habitation and should be condemned and shut down.

528.  Order defendants to have plaintiff's eye seen and treated by an ophthalmologist.

529. Order defendants to have plaintiff's eye diagnosed with the use of an ultrasound examination.

530. Enjoin defendants from charging plaintiff medical co-pay payments pursuant to 11 Del. C. § 6536.

531. Enjoin defendants from charging multiple co-pay charges for sick calls seeking treatment for the same ailment that was not treated in the previous visits made seeking treatment.

532. Enjoin defendants from allowing any security personnel to participate in grievance hearings in violation of HIPPA, unless plaintiff's HIPPA right is waived by plaintiff.

533. Enjoin defendants from denying plaintiff exercise of his First Amendment rights by accessing email, Skype, eBooks and the internet.

534. Enjoin defendants from denying plaintiff his right to read "Sexual Secrets of the White Tigress" and the ESPN Body Issue.

535. Order defendants and GTL to provide the contracted 15 minute telephone calls.

536. Order defendants to provide all mail rates and services available via the U.S. postal system, including but not limited to 4th class, book rate, parcel post, 3rd class, overnight mail, and second class mail.

537. Enjoin defendants from requiring plaintiff to sign a blank check voucher that allows them to draw any amount they choose from his account when he seeks to exercise his First Amendment right to send out mail.

538. Plaintiff requests this court to provide all other injunctive relief that court deems to be appropriate.

539. Order defendants to deduct all of the Meritorious Good Time plaintiff has earned from his life sentence.

540.  Order defendants to deduct the 45 to 55 days of statutory good time plaintiff earned prior to the *State v. Spence* decision from his life sentence.

541.  Enjoin defendants from denying plaintiff at least three hours of special visiting time when plaintiff has a visitor who travels from beyond a 100 mile radius.

542.  Enjoin defendants from denying regular visits when the visitor has arrived at the prison prior to 10 minutes into the scheduled visit.

543.  Enjoin defendants from denying regular visits when the visitor has arrived at the prison prior to the commencement of the scheduled visiting period.

544.  Enjoin defendants from curtailing visits before the actual allotted visiting time has arrived.

545.  Order visits to provide the full amount of visiting time that has been scheduled and not to curtail visits so that guards can leave their posts early.  Forty-five minute visits will have 45 minutes; 90 minute visits will have 90 minutes.  Three hour visits will have three hours.

546.  Order defendants to permit plaintiff to obtain essential oils for religious purposes.

547.  Order defendants to change plaintiff's religious designation from Islam to Fitrah.

548.  Enjoin defendants from requiring that plaintiff submit to the religious authority and interpretation of Wahhabi Imam Waters since he objects to any ministerial intervention by Defendants Waters in accordance with the IRM and DOC policy.

549.  Order defendants to obey their own policy and permit plaintiff to possess seven books that are not a part of his religious obligatory readings.

550.  Order defendants to permit plaintiff to obtain, listen to and/or view DVDs, tapes and other such media providing presentations from Kemitic Yoruba priests, initiates, bababawos, hemets and scholars.

551.  Enjoin defendants from placing a substantial burden upon plaintiff's practice of his Kemitic Yoruba Fitrah religion.

552.  Order defendants to permit plaintiff to wear Kemitic Yoruba Fitrah attire at appropriate ceremonial and religious service times.

553.  Order defendants to provide regular medical examinations to catch plaintiff's diagnosed vitreous detachment before it causes complete retinal detachment which will cause blindness if not treated within two days.  Under the prison protocol it will take approximately six months following full detachment before plaintiff would even see a retina specialist for treatment.

554.  Order defendants to return a working, accurate clock to the prison visiting room.

555.  Enjoin defendants from preventing plaintiff from utilizing the toilet during recreation periods and to refrain from punishing him from using said facilities by curtailing his recreation if he has to use the toilet.

556.  Enjoin defendants from subjecting plaintiff to biotech experimentation by forcing GMO him to consume genetically modified food against his will and against his religious beliefs.

557.  Enjoin defendants from forcing plaintiff to consume a nearly total fast, processed meat and food diet.

558.  Enjoin defendants from requiring plaintiff to obtain multiple Pardon Board recommendations before the governor can sign his sentence commutation application.

558a.  Order defendants to sell organic feed, fresh fruit, and vegetables in the prison commissary.

Declaratory Relief

559.  Plaintiff seeks declaratory judgment as follows:

560.  That security guards' presence within medical grievances violates HIPPA.

561.  Defendants placed a substantial burden on plaintiff's religious practice by refusing to process grievance # 319522.

562.  Requiring plaintiff to pay medical co-pays pursuant to a statute that was enacted two decades after his imprisonment is violative of ex post facto.

563.  The governor has the power under the Delaware Constitution to sign plaintiff's 1991 unanimous recommendation from the Pardon Board that his life without parole sentence be commuted to life with parole.

564.  Governor has the authority to commute plaintiff's sentence by any amount less than six months without plaintiff having to receive a recommendation from the Pardon Board.

565.  Plaintiff, having already received a favorable recommendation for sentence commutation, is not required to seek additional recommendations and the governor has the power to grant a commutation to plaintiff if he so chooses.

566.  Neither the Delaware Constitution nor statute prohibits the governor from acting on a sentence commutation application that requests less than six months reduction or one from an applicant who has previously been favorably recommended by a majority of the members of the Board of Pardons.

567.  Plaintiff has the right to have the statutory good time he accrued prior to the *Spence* decision deducted from his life sentence.

568.  Plaintiff has the right to the Meritorious Good Time he earned to be deducted from his life sentence.

569.  Pursuant to the Interstate Corrections Compact, plaintiff has a right to have the good time he earned during three and a half years of transfer to the federal system and nine years from his transfer to Arizona accrued and deducted from his life sentence.

570.  For purposes of calculating good time, plaintiff's life sentence is to be considered a fixed term of forty-five (45) years.

571.  Providing no alternative to plaintiff but to consume JTVCC's menu and diet of practically all processed meat, processed food and fast food and its over feeding of carbohydrates is cruel and unusual punishment in violation of the 8th Amendment to the U.S. Constitution.

572.  Complete denial of plaintiff to access to modern electronic means of communication is violative of his First Amendment rights.

573.  Order defendants to have an independent dietician and nutritionist agreed to by plaintiff devise a menu that is up to scientific standards of proper nutrition and health.


Compensatory Damages

574.  Defendants must reimburse plaintiff $200 for all telephone charges of 15 minutes when his calls were only for 10 minutes.

575.  Defendants must reimburse plaintiff $500 for all postage overcharges.

576.  Defendants must reimburse plaintiff $2000 for the difference between the costs of snail mail versus email for all of the first class stamps plaintiff purchased when he could have used email.

577.  Defendants must reimburse plaintiff $6,000.00 for the cost of transportation and hotel expenses for trips made by his wife to visit when they denied the full special visiting and regular visiting times to which plaintiff and his wife were entitled.

578.  Defendants must reimburse plaintiff for the cost of the book and postage and handling for the book *Sexual Teachings of the White Tigress*.

579.  Defendants must reimburse plaintiff for the cost of the book and postage and handling for the magazine *ESPN The Magazine* "Body" Issue.

Punitive damages

580.  Plaintiff seeks punitive damages of $100,000 from each defendant.

581.  Grant such other relief as it may appear that plaintiff is entitled.

Date: 4 - 30 - 16

Respectfully submitted,

Amir Fatir # 137010
1181 Paddock Road
Smyrna, DE  19977

JAMES T. VAUGHN CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

Clerk
U.S. District
844 N. King St.
Wilmington
DE 19801

U.S.M.S.
X-RAY

$ 006.85°

Legal
Mail